MEMORANDUM OF DECISION
This memorandum of decision addresses a petition filed by the Department of Children and Families (DCF) on March 27, 2001, seeking to terminate the parental rights (TPR) of Sally S-P. and Joseph M., the biological parents of Daniel M., born February 1991. Other pending petitions addressed herein seek to terminate the parental rights of Sally S-P. and Alan P., the biological parents of Tyler S., born July 1996; Alissa S., born May 1997; and Angela S., born August 1998. The original TPR petition against Alan P. alleged his failure to achieve statutory rehabilitation; that petition has been amended to reflect the ground of consent. The TPR petition against Sally S-P. and Joseph M. alleged that these parents had also failed to achieve statutory rehabilitation. For the reasons stated below, the court finds all matters in favor of the petitioner.
DCF obtained custody of Tyler, Alissa and Angela through an Order of Commitment entered on November 30, 1999. The court entered an order of protective custody as to Danny[2] on that date, allowing him to remain with Sally P., but this order was modified and the child was committed to DCF custody on January 13, 2000. All four children have since been maintained in DCF custody pursuant to court orders.
Trial of this highly-contested matter took place on December 12, 13 and 14, 2001; January 9, March 12, and April 9, 2002.[3] The petitioner, Joseph M., Alan P., Sally S-P. and the children were vigorously represented by counsel:[4] Joseph M. was in attendance throughout the proceedings, but Sally S-P. did not appear at any of the scheduled hearing dates.[5] On December 12, 2001, the court accepted Alan P.'s consent to the TPR petitions involving all three of his children. On or before April CT Page 10900 29, 2002, counsel for the parties and the children submitted thorough and comprehensive trial briefs addressing the multiple factual and legal issues that were raised at trial.
The Child Protection Session of the Superior Court, Juvenile Matters, has jurisdiction over the pending case. Notice of this proceeding has been provided in accordance with the applicable provisions of the Practice Book. No action is pending in any other court affecting custody of the children.
 I. FACTUAL FINDINGS
The Court has thoroughly reviewed the verified petitions, the TPR social study[6] and the multiple other documents submitted in evidence which included specific steps, records of prior court proceedings, laboratory reports, narrative summaries maintained by DCF, social workers' notes, correspondence between Danny's attorney and his therapist, records related to Joseph M.'s criminal history and parole status, photographs, and psychological reports. The court has utilized the applicable legal standards in considering this evidence and the testimony of trial witnesses,[7] who included the respondent father, the respondent father's mother, the mother of the respondent father's two daughters, the foster mother, a DCF worker, a psychologist, and the child's therapist. Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial:
I. A. SALLY S-P., THE MOTHER
Sally S-P. was born on April 11, 1973, and has completed schooling through the seventh grade, and has worked as a bookkeeper, manager, waitress and house cleaner, but she has also encountered long periods of unemployment. Sally S-P. has been known to the DCF since the late 1980's, and was herself maintained in DCF custody as an adolescent. She was placed as a foster child in single and group homes, after being sexually abused by her older sister, a babysitter, and her father's friends and co-workers. (Exhibits 1, 11, 12.)
Sally S-P. met Joseph M. while participating in the Job Corps. Their child, Danny, was born on February 1991. In 1995, Sally S-P. was admitted to a local hospital for treatment of depression. At that time, Danny was cared for by his paternal grandmother, Irene A., to whom the Probate Court granted guardianship on June 14, 1995. The Probate Court reinstated Sally S-P's guardianship for Danny in February 1997. (Exhibit 1.)
Sally S-P. and Alan P. married in 1998, after their children Tyler, CT Page 10901 Alissa and Angela were born. In 1998, Sally S-P. received a second round of inpatient treatment for depression at a local hospital. (Exhibit 1.) Sally S-P. has been diagnosed with Major Depression; she is not consistently compliant with her prescribed medication therapy. (Exhibits 1, 11, 12.)
In April of 1998, when all four children were living with her and Alan P., Sally S-P. began to use crack cocaine. Aware of her need for treatment, Sally S-P. started attending sessions at the Care Plus Partial Hospitalization program (Care Plus). However, she did not complete the program, as she was discharged for noncompliance in September 1999.
On November 30, 1999, the court (Driscoll, J.) adjudicated Danny, Tyler, Alissa and Angela to be neglected upon allegations of Sally S-P.'s substance abuse, mental health and domestic violence issues, and lack of supervision over the children.[8] (Testimony of Ellen M.) The three younger children were committed to DCF and placed in foster care. The court entered an order of protective custody which allowed Danny to remain in Sally S-P.'s care, and ordered specific steps for her to follow in achieving reunification with her other children. (Exhibit 2a.)
These specific steps, among other things, required Sally S-P. to refrain from substance abuse and to avoid involvement with the criminal justice system. Although she commenced an intensive outpatient substance abuse program at Care Plus on December 15, 1999, in January 2000, Sally S-P. admitted to DCF that she had relapsed into drug use, and that she could no longer care for Danny. (Testimony of Ellen M.) On January 13, 2000, the court (Driscoll, J.) rescinded Danny's protective supervision status, and the child was committed to DCF. All four children have remained in DCF foster care at all relevant times, pursuant to court orders. (Exhibit 1.)
Sally completed the Care Plus program on March 24, 2000. She attended substance abuse treatment at Community Mental Health Services of Southeastern Connecticut (CMHSSC), but was discharged from this program for lack of attendance. (Exhibits 1, 12.) She did not complete the parenting classes to which DCF referred her at Madonna Place and the Child and Family Center, and she did not follow through with the referral to the Child Guidance Clinic where parenting instruction was also available. Sally S-P. did not participate in the individual counseling to which she was referred at CMHSSC, Southeastern Council on Drug Dependence (SCADD), or with private therapists. Her compliance with outpatient substance abuse treatment at SCADD and CMHSSC was sporadic and incomplete. (Testimony of Ellen M.) CT Page 10902
During the latter part of 2000, Sally S-P. relapsed in drug use on multiple occasions. In September 2000, she declined the opportunity to participate in the Thames River Family Program. She was involved in domestic violence with Alan P., and their marriage was unstable. In recent years, housing difficulties have led Sally S-P. to seek temporary shelter, and she has not secured or maintained adequate, stable housing. Since November 1999, Sally S-P. has missed nearly one fourth of scheduled visits with her children. (Exhibit 11; Testimony of Ellen M.)
Sally S-P. has undergone two court-ordered evaluations by Kelly Rogers, Ph.D., a clinical psychologist who is skilled in forensic assessments. In the fall of 1999, clinical observation and test results showed Sally S-P. to be strongly impulsive, likely to distort social feedback, and functioning at the high average level. She was diagnosed with Histrionic Personality Disorder. (Exhibits 11, 12; Testimony of Dr. Rogers.) Dr. Rogers again evaluated Sally S-P. and her children in the fall of 2001. When the children greeted their mother with enthusiasm at this session, and she was quite affectionate to the younger children, but not to Danny. (Exhibit 11.)
On December 19, 2000, the court (Driscoll, J.) ruled that further reunification efforts were no longer appropriate for Sally S-P. (Exhibits CC, DD.) The TPR petition against Sally S-P. was filed on March 27, 2001. Despite her counsel's dedicated and appropriate efforts at securing her presence at the duly-noticed trial, Sally S-P. failed to appear. Accordingly, on December 13, 2001, the court granted the petitioner's motion and entered a default against the respondent mother.
I. B. JOSEPH M., THE FATHER OF DANNY
Joseph M. was born on July 22, 1972. A high school graduate, he has worked in factories, as an auto mechanic, a waiter, safety inspector and at a loading dock. Outside of the Department of Corrections (DOC), his last reported employment was over three and a half years ago. Joseph M. received unspecified psychiatric medication through a local hospital in 1998, but discontinued counseling and medications after three months of care. (Exhibits 11, Y.)
As found in Part I. A., Danny was born to Joseph M. and Sally S-P. in February 1991. As found in Part I.C, Joseph M. was incarcerated at the time of Danny's birth, but he thereafter resided with Sally S-P. and their baby on a sporadic basis for a limited time. (Testimony of Joseph M.) In 1993, Joseph M. became involved with Debora D., and their child Amanda was born about a year thereafter.[9] (Testimony of Debora D.) Joseph M. then elected to live with Debora D. and his young daughter CT Page 10903 while Sally S-P. was being treated for depression. He ceded responsibility for Danny's care to the boy's paternal grandmother, Irene A., to whom the Probate Court had granted guardianship in June 1995. See Part I. A. (Exhibit 1; Testimony of Joseph M.)
In the summer of 1995, when Daniel was almost four and a half years old, Joseph M. received an eighteen month sentence of incarceration after convictions for burglary, larceny, and interfering with an officer. (Exhibit 6; Testimony of Joseph M.) Joseph M. completed this sentence in January 1997, was discharged from prison, and Joseph M. remained at liberty for a little over a year thereafter. (Testimony of Joseph M.) As found in Part I. A., the Probate Court returned Danny to Sally S-P.'s sole care and custody in February 1997, after Joseph M.'s release from incarceration. (Exhibit 1.)
In February and March, 1998, while Danny was living with Sally S-P. and Alan P., Joseph M. was again arrested: he was subsequently convicted of burglary, larceny, resisting arrest, and criminal trespass.[10] Joseph M. remained incarcerated from March 1998 until January 2002, serving a persistent offender sentence of five and a half years, suspended after four and a half years, reduced by six months.[11] (Exhibits 6, A-16; Testimony of Joseph M.)
On November 30, 1999, Joseph M. presented a nob contendere plea in response to the neglect allegations pending against him: tendered while the respondent father was incarcerated, this plea was made knowingly, voluntarily, and with the assistance of counsel.[12] (Court Exhibit 3; Testimony of Joseph M.) On that date, the court (Driscoll, J.) also ordered specific steps for Joseph M. to follow in achieving rehabilitation and reunification with his son. (Exhibit 3.) Among other things, the steps required him to participate in parenting counseling and DOC-sponsored programs. While serving the first part of his most recent sentence, Joseph M. participated in multiple DOC-sponsored programs relevant to his rehabilitation.[13] (Exhibits Z, A-1a.)
In September 2001, Dr. Rogers conducted a court-ordered evaluation of Joseph M. and an interactional assessment with Danny.[14] Through a the interviews and psychological testing, Joseph M. was revealed to function at an average intellectual level, with some indications impulsivity. "He appears to be an angry man with a strong sense of entitlement and a low regard for the rights and feelings of others . . . Given his history, a notation of Alcohol abuse (in remission, in a controlled environment) was warranted. Antisocial and Narcissistic Personality Traits were apparent and his history appears consistent with Antisocial Personality Disorder." (Exhibit 11.) In his psychological interview by Dr. Rogers, Joseph M. CT Page 10904 denied having a gambling problem, although he admitted at trial that such issues exist. (Exhibit 11; Testimony of Joseph M.)
At a hearing held on November 27, 2001, the Connecticut Board of Parole established conditions for Joseph M.'s prospective discharge, including participation in outpatient addiction services, mental health evaluation and treatment as necessary, and prohibition of contact with any gambling establishment or ingestion of alcohol. (Exhibit X; Testimony of Joseph M.) Joseph M. was released on parole on January 8, 2002, after three days of trial. (Testimony of Joseph M.)
I. C. JOSEPH M.'s HISTORY OF INCARCERATION
In addition to the criminal convictions described above, Joseph M. has accumulated multiple convictions for burglary, assault, breach of peace, resisting arrest, trespass, criminal mischief, and violation of probation a protective order in the state of Connecticut. His history of convictions led to his sentencing as a persistent larceny offender in December 1998.[15] (Exhibits 6, A-16.)
While serving his most recent sentence, Joseph M. was confined at a number of DOC facilities in this state; he was also held in the state of Virginia. He was incarcerated at Corrigan, Bridgeport, Walker, Cheshire, Radgowski, Osborne, and Brooklyn Correctional Institutions during the period of March 1998 through April 2000, accumulating a total of fifteen transfers.[16] (Exhibits 11, Z; Testimony of Joseph M.) In the fall of 2000, he was transferred by the DOC to Virginia's Wallens Ridge Prison, where he remained until mid-December 2000. Thereafter, he was returned to Connecticut, and held at McDougall, Cheshire, Osborne and Radgowski until his discharge in January 2002. (Exhibits 1, HH, M, A-1; Testimony of Joseph M.)
Although, as found in Part I. B., Joseph M. attended a number of rehabilitation programs while serving this sentence, the evidence also reflects that he violated the rules regulating inmate behavior on a number of occasions. As a result, he received nine "tickets, " or disciplinary actions, from March 1998 through January 2002.[17]
(Exhibit Z; Testimony of Joseph M.) In September of 1998, in response to violation of DOC rules, Joseph M. lost his recreational privileges for a period often days. In April 2000, he was found to be in possession of contraband, was placed in segregation for fifteen days, and lost his visiting privileges for sixty days. For another offense in April 2000, Joseph M. was required to serve an additional five days in segregation, and lost his telephone privileges for forty-five days. In June 2000, Joseph M. engaged in an argument with a correction officer, and received CT Page 10905 thirty days loss of recreational privileges for causing a disturbance. In August 2000, he was placed in punitive segregation for eight days for disobedience. In October 2000, while in a Virginia correctional facility, Joseph M. received five days of segregation for failure to obey a reasonable order. In April 2001, while he was ostensibly engaged in an anger management class, Joseph M. and his cellmate were engaged in an argument. As a result of the disruption that he caused, Joseph M. received a penalty of five days in segregation, and thirty days of confinement to his cell.[18] (Testimony of Ellen M., Joseph M., Dr. Rogers.)
I. D. ALAN P.
As found in Part I. A., Alan P. is the father of Tyler, Angela, and Alissa. On December 13, 2001, the court (Levin, J.) accepted Alan P.'s knowing and voluntary consent to the TPR petitions involving all three of his children.
I. E. THE CHILDREN
On November 30, 1999, upon their neglect adjudication and commitment to DCF, the three younger children were placed together in Holly and Daniel P.' s licensed foster home. Danny joined them at the foster home on January 13. All four children have lived comfortably and safely in their foster home since that date. (See Exhibit 1.) The foster parents, who are aware that each of the children has special educational and/or emotional needs, wish to adopt the siblings. (Exhibit T; Testimony of Ellen M., Holly P.)
I. E. 1. DANNY
Danny was born on February 1991. He is a well-developed, independent child with a bright, engaging smile, who often appears to be mature beyond his chronological age. (Exhibits A-7, A-13, A-14; Testimony of Ellen M., Holly P.)
As found in Parts I. A. and B., Danny resided with his paternal grandmother, Irene A., apart from either Sally S-P. or Joseph M., from June 1995 through February 1997, pursuant to a Probate Court order. In February 1997, the Probate Court ordered Danny to be returned to his mother's care and custody, and for the next three years Danny resided with his biological mother, Alan P. and their children. During this period, the child all became firmly reattached to Sally S-P. and bonded to Alan P.; Danny came to see Alan P., not Joseph M., as his psychological father.[19] Furthermore, although Danny continued to visit CT Page 10906 with Irene A. on occasion, any maternal bond with this grandmother was fully displaced by that which developed with Sally S-P. (Exhibit 11; Testimony of Ellen M., Dr. Rogers.) When the children resided with Sally S-P., Danny was called upon to supervise his younger half-siblings at an unreasonably early age. (Exhibits D, F.) As a result, he developed persistent parentified behaviors. (Testimony of Dr. Rogers.)
Efforts to reunify Sally S-P. with Danny continued after he entered foster care in January 2000. At Sally P.'s request, in an effort to enhance the mother-child bone, Danny's visits with Irene A. were suspended after the spring of 2000. (Exhibit Q.) As found in Part I. A., on December 19, 2000, the court found that further reunification efforts were no longer appropriate for Sally S-P. Thereafter, in May 2001, DCF agreed to provide Irene A. with two all day visits with Danny each month. (Exhibit Q.)
Visits between grandmother and ten-year old Danny commenced, but were not successful. (Testimony of Ellen M., Holly P., Ashley S.) In September 2001, Irene A. informed Danny that her husband was not his biological grandfather. This disclosure had a significant negative effect on the child, who then decided he wanted to limit visits with Irene A.[20]
(Exhibit 5; Testimony of Ellen M., Holly P., Dr. Rogers.)
DCF referred Danny for individual counseling to help deal with his feelings associated with being a child who has had several caregivers. (Testimony of Ellen M., Ashley S.) Since June 2000, Danny has received counseling from Ashley S., a highly experienced licensed clinical social worker at the Child Family Agency of Southeastern Connecticut. (Exhibit 11; Testimony of Ellen M., Ashley S.) Danny has been diagnosed with Adjustment Disorder, which is manifest through his worry, sadness, and discomfiture at the process in which he and his half-siblings are involved. (Testimony of Ashley S.) Emotionally, Danny is a "troubled boy who is working very hard to present a calm and controlled exterior." (Exhibit 11.) Nonetheless, he is thriving in the care of his foster parents, and is beginning to develop the ability to form valid peer relationships as evidenced by the friendships he is beginning to found with children at school.[21]
As he enters adolescence, Danny enjoys a wide variety of age-appropriate activities including swimming, soccer, organized boxing, drawing and beginning piano lessons. (Exhibit 11; Testimony of Holly P.) He is pleased to be living in his foster home and since the summer of 2001, Danny has made it clear that he wants to be adopted by Holly and Daniel P. However, Danny also desires visitation with Sally S-P., Alan P., Joseph M., and Irene A. following his adoption.[22] (Exhibit AA; CT Page 10907 Testimony of Ashley S., Holly P.)
I. E. 2. TYLER, ALISSA AND ANGELA
Placed in their care more than two and a half years ago, all three of the younger children are firmly bonded to their foster parents, Holly and Daniel P.[23]
Tyler, who was born on July 1996, functioned in a low average range during kindergarten last year. (Exhibit 11.) He understands that he has biological parents as well as foster parents, and has indicated that he would like to stay with Holly and Daniel P. until his biological parents ""change."' (Exhibit 11.) Tyler's noted dependency needs appear to arise from confusion about his status and placement as a foster child. He carries a diagnosis of Adjustment Disorder with Disturbance of Conduct, and receives individual counseling from Noel K. at the Child Guidance Clinic to address this condition. (Exhibits 11, U.)
Alissa was born on May 1997. She also understands that she has biological parents as well as foster parents. (Exhibit 11.) She has been assigned to special education services through her public pre-school program. (Exhibit 1.)
Angela, who was born on August 1998, suffers from an apparent developmental delay and speech deficits. (Exhibit 11.) She has received Birth to Three services to address those special needs which are apparent at her young age. (Exhibit 1.)
 II. ADJUDICATION: LOCATION AND REUNIFICATION EFFORTS
As to the adjudicatory phase of these proceedings,[24] insofar as the allegations against Sally S-P. and Joseph M. concern the degree to which each has achieved statutory rehabilitation, the court has considered the evidence related to circumstances and events prior to the date on which the TPR petitions were filed, and has also considered the evidence and testimony related to circumstances through the close of trial.[25] Upon review, the court has determined that grounds for termination exist as to both Sally S-P. and Joseph M., and relies upon Alan P.'s valid consent to the termination of his parental rights.
II. A. STATUTORY LOCATION AND REUNIFICATION EFFORTS
General Statutes § 17a-112 (j)(1) provides that the court "may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . that the Department of Children and Families has CT Page 10908 made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." In the context of TPR matters, reasonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case. (Internal quotation marks omitted.) In re Hector L., [supra, 53 Conn. App. 372]."[26] In reAntonio M, 56 Conn. App. 534, 547, 744 A.2d 915 (2000); see also In reDaniel C., 63 Conn. App. 339, 362, 776 A.2d 487 (2001).
II. B. SALLY S-P., THE MOTHER
In evaluating the reasonable efforts directed at reunification of Sally S-P. with her children, the court again notes that this respondent did not attend the TPR trial despite due notice. As found in Part I. A., on December 19, 2000, the court found that further efforts at reunification were no longer appropriate for Sally S-P. Prior to December 19, 2000, the evidence clearly, convincingly and consistently indicates that DCF extended reasonable reunification efforts to the respondent mother. (Exhibits 1, JJa.) Parenting training through supervised visitation sessions at the Smith Bent Children's Center was extended to Sally S-P. from January to June of 2000, but this service was terminated because of the respondent mother's relapse into drug use. Although DCF-supervised weekly visitation was also scheduled, Sally S-P. has admitted that she only intermittently attended these sessions. (Exhibit 11.) Based on the clear and convincing evidence including her repeated relapses into cocaine use and her failure to satisfactorily or meaningfully respond to visitation services, and noting her absence from all of the court proceedings related to the TPR trial, the court now finds the evidence to clearly and convincingly establish that Sally S-P. is unable or unwilling to benefit from reasonable reunification efforts. § 17a-112 (1)(1). As such, the petitioner has established this critical element of the TPR petition against her.
II. C. JOSEPH M., DANNY'S FATHER
The petitioner has met her burden of proving, by clear and convincing evidence, that reasonable efforts were made to reunify Joseph M. with Danny, as contemplated by § 17a-112 (1)(1), but that under the circumstances of this case, the respondent father was unable or unwilling to benefit from such efforts.[27] From the time of Danny's neglect adjudication in November 1999 through early January 2002, Joseph M. was incarcerated, and was not a viable placement resource for his son. CT Page 10909 (Exhibit T.) Nonetheless, on a reasonably regular basis when Joseph M. was within the state of Connecticut and when DCF was reasonably able to locate his place of incarceration, DCF extended the only efforts at reunification efforts that were practicable and reasonable efforts under the circumstances of this case, by transporting Danny to visits with his imprisoned father.[28] (Exhibit U; Testimony of Ellen M.)
Although DCF did not directly extend parenting education or related counseling services to Joseph M. while he was serving his most recent sentence, as fully set forth in Part I. B., this resourceful respondent actually received educational, rehabilitative and mental health services from the DOC.[29] (Exhibits Z, A-1a.) Pursuant to General Statutes § 18-81, the Commissioner of Correction, not DCF, is responsible for providing "treatment, vocational and academic education" programs to individuals like Joseph M., when they are incarcerated.[30] In addition, as discussed above, DCF provided Joseph M. with the visitation services that were appropriate to the circumstances of his incarceration, given the repeated transfers to which he was subject from March 1998 through early 2002, as fully set forth in Part I. C. Thereby, the agency fulfilled its obligation to make reasonable efforts to reunify Joseph M. with Danny, under the circumstances of this case. See In reRoshawn R., supra, 51 Conn. App. 56-57.
Moreover, the clear and convincing evidence produced at trial establishes that Joseph M. is unable or unwilling to benefit from reasonable reunification services. The evidence is replete with indicia of Joseph M. "5 fundamental oppositional and uncooperative relationship to authority figures, providing a firm basis for the determination that this respondent cannot or will not effectively utilize such services when they are extended. Joseph M.'s lengthy history of repeating criminal acts, his resultant incarceration during a great part of Danny's lifetime, and his status as a persistent larceny offender indicate that he has little or no ability or willingness to modify his behavior in a positive way notwithstanding the multiple opportunities for rehabilitation he has received through repeated sentences of probation and incarceration.[31] This inability or unwillingness to conform his conduct to acceptable norms is found in the clear and convincing evidence establishing that Joseph M. exhibited repeated misconduct notwithstanding the imposition of numerous disciplinary "tickets" and sanctions during both his incarceration from 1995 through 1997, and his incarceration from 1998 through the beginning of 2002.[32]
In determining that Joseph M. is unable or unwilling to benefit from reasonable reunification efforts, the court credits the relevant evidence adduced through Dr. Rogers, the court-appointed psychologist who examined CT Page 10910 Joseph M. in September 2001, as set forth in Part III. B. Dr. Rogers's detailed expert testimony and cogent, well-founded opinions provided clear and convincing evidence that Joseph M.'s personality style reflects prominent risk-taking features, persistent minimization of his obvious history of criminal offenses and rule violations, and a concomitant limited ability or willingness to cooperate with structure and reasonable, corrective discipline when it is imposed upon him. Dr. Rogers's opinions establish a firm basis for the court's conclusion that Joseph M. is so entrenched in his ways, and so resistant to positive change promoted by institutional guidance or rehabilitation efforts, that he is psychologically unable or unwilling to benefit from any reasonable reunification services. (Testimony of Dr. Rogers.)
Joseph M. contends that because DCF did not make his son sufficiently available to him for visits, after the child entered DCF custody in January of 2000, the court is precluded from finding that the agency provided him with reasonable reunification efforts This assertion is not supported by the evidence, which clearly and convincingly establishes that DCF provided visitation with Danny on reasonable basis while the respondent father was confined in Connecticut, and when his whereabouts were reasonably made known to the department.[33] Furthermore, as discussed in Part I. C., Joseph M. was sometimes unavailable for visitation because he had violated prison regulations, and was subject to disciplinary actions which eliminated his access to Danny. Court Exhibit 5 sets forth the dates on which prison visits between Joseph M. and Danny took place according to a search of DCF narratives: April 16 or 18, and August 28, 2000; January 24, February 21, March 21, October 25, November 8, and December 6, 2001.[34] (Testimony of Ellen M.) DCF's reasonable decisions, with regard to scheduling visitation for the respondent father, accommodated the fact that Danny has often been required to travel a considerable distance, and to wait for lengthy periods, prior to visiting with his father at many of the DOC facilities to which he had been while incarcerated in Connecticut.[35] (Exhibit J.) Overall, despite Joseph M.'s vigorous contention to the contrary, the evidence clearly and convincingly supports the conclusion that any limitations in the effective visitation schedule, were due to circumstances of his own making or made in reasonable deference to the Danny's best interests, and not because of any unreasonable acts or omissions on the part of the child protection agency or any other third party.[36] See Part. III. B. 7.
Joseph M. also protests that DCF's reunification efforts were not reasonable in nature because the agency and the foster parents talked to Danny about issues involved in the pending litigation, unnecessarily interfering with the father-child bond. Although such disclosures may CT Page 10911 have been unfortunate, the evidence clearly and convincingly establishes that any related information the child obtained from DCF or the foster parents was merely cumulative of what Danny had been told by others, including Irene A.[37] For instance, in the course of providing treatment and relief for Danny's confusion and concerns over his foster child status, the implications of various legal parenting relationships have been the subject of individual counseling sessions with the child's therapist, Ashley S. (Testimony of Ashley S.) Although the DCF social worker has also discussed some legal issues with Danny, the court finds that these disclosures were reasonable and appropriate given Danny's continuing questions about his foster care situation. (See Testimony of Ellen M.) The foster mother's role in such discussions was minimal, and merely supportive in nature.[38] (Testimony of Holly P.) Thus, any disclosures about the TPR litigation, made by DCF or a foster parent, cannot objectively be found to have affected the father-son reunification process in any quantifiable way.
Accordingly, based on the totality of the foregoing circumstances, the has determined that DCF provided reasonable efforts at reunifying Joseph M. and his son, but that the respondent father was unwilling or unable to respond to such reasonable efforts. § 17a-112 (j)(1).
II. D. IRENE A., DANNY'S PATERNAL GRANDMOTHER
Joseph M. also argues that DCF failed to promote a bond between Danny and Irene A., and that the petitioner therefore cannot meet her burden of proving that reasonable efforts at reunification were made in this case. Specifically, Joseph M. claims that Connecticut statutes and case law require DCF to provide reasonable reunification efforts with the child's paternal grandmother as well as the child's father, under the circumstances of this case.[39] Upon review, the court determines that this claim carries little weight, and there declines to apply Joseph M.'s proposition.
Joseph M.'s present contentions are first defeated by the reasonable statutory construction of the clear and unambiguous text of § 17a-112
(j)(1).[40] Under this statute, as noted in Part II. A., before terminating parental rights, the Superior Court must find by clear and convincing evidence "that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that theparent is unable or unwilling to benefit from reunification efforts[.]" (Emphasis added.) As § 17a-112 (j)(1) does not utilize the term "grandparent, " but expressly contains the word "parent, " it facially indicates that DCF has no statutory obligation to provide reasonable CT Page 10912 efforts at reunification father and son by incorporating a grandmother into the process.
In applying § 17a-112 (j)(1), the court must follow the long-honored rule of statutory construction: "Where the meaning of a statute is plain and unambiguous, the enactment speaks for itself and there is no occasion to construe it. Its unequivocal meaning is not subject to modification by way of construction." Pitchell v. City ofHartford, 247 Conn. 422, 432 (1999); Grievance Committee for theHartford-New Britain Judicial Branch v. Trantolo, 192 Conn. 15, 22
(1984); Holmquist v. Manson, 168 Conn. 389, 393 (1975); Hurlbut v.Lemelin, 155 Conn. 68, 73 (1967). Because DCF's duty to provide reasonable reunification efforts is plainly and unambiguously limited to a person who occupies the position of"parent" under § 17a-112 (j) (1), the court need merely turn to any applicable definition of that term which has been adopted by the legislature for use in such cases. General Statutes Section 17a-93 sets forth the definitions that shall be used in applying the child protection statutes; the term parent is plainly and unequivocally defined in § 17a-93 (b) as "natural and adoptive parent" without any mention of persons who occupy other degrees of legal relation to the child. Thus, reference to the applicable rules of statutory construction leave the court with the clear and unambiguous statement contained in § 17a-112 (j)(1), logically establishing that reunification through a grandparent is neither a part of the legislature's mandate to DCF, nor a predicate to termination of parental rights.
Like its legislation, Connecticut's case law fails to support Joseph M.'s assertion that "grandparent" must be included in or implied by the term "parent" within the meaning of § 17a-112 (j)(1). In TPR matters, our courts have found reunification efforts are applicable only to a child's father or mother, not to a grandparent or other third party. See, e.g., In re Savanna M., 55 Conn. App. 807, 812-813, 740 A.2d 484
(1999) (DCF met burden of proving reasonable efforts where a long-imprisoned father was had insufficiently attempt to directly contact his child); In re Hector L., supra, 53 Conn. App. 372 (DCF met reasonable efforts by providing monthly transportation to the children who visited their father while imprisoned); In re Roshawn R., supra. 51 Conn. App. 56,58-59 (for a long-incarcerated father, DCF's provision of in-prison visits constitutes a reasonable effort at reunification). These cases address family preservation efforts made by DCF under factual circumstances similar to those of the case at issue, and fail to reflect any obligation on DCF's part to include other family members such as a grandparent, in the reunification process. In re Savanna M. and In reHector L. use like language in identifying the nature of the reasonable CT Page 10913 efforts requirements required for incarcerated parents under the legislative predecessor to § 17a-112 (j)(1): "the statute imposes on the department [of children and families] the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents." (Emphasis added.) In re Savanna M., supra, 53 Conn. App. 810; In reHector L., supra, 53 Conn. App. 370. Without equivocation, this court therefore finds that Connecticut case law supports the plain meaning the reasonable efforts statute, and does not support Joseph M.'s submission that reunification services must have included the paternal grandmother in the process of reuniting father and child, in order to meet the standard required by § 17a-112 (j)(1).
However, even if Joseph M.'s claim in this regard is found to be legally sufficient, and DCF is obligated to reunify a grandmother and a child who is subject to a TPR petition, an objective evaluation of the evidence clearly and convincingly establishes that, under the circumstances of this case, DCF did make reasonable efforts to include Irene A. in the reunification process. It is important to remember that from February of 1997 through January of 2000, Danny was in the care and custody of his biological mother, Sally S-P.[41]
After Danny was placed in foster care in January 2000, and while Joseph M. was incarcerated and unable to care for his son, DCF reasonably continued to focus its efforts on its statutory obligation to reunite Danny with his biological mother, who was more available to the agency. Sally S-P. expressed overt concerns that if Danny was permitted to reinstitute close contact with his paternal grandmother, it would interfere with her own ability to maintain a parenting connection with her child. Sally S-P. specifically requested DCF to limit Danny's contact with Irene A. during the commitment period, as a means of allowing her to retain and enhance her own mother-child relationship with the child. (Testimony of Ellen M.)
In a reasonable effort to promote that mother-child reunification process, DCF judiciously limited Danny's contact with his paternal grandmother. It was not until December 2000 that the court ruled that no further efforts were appropriate for the reunification of Danny with Sally S-P., invalidating the biological mother's concerns In May 2001, following the institution of the TPR petition, DCF reached agreement with Irene A., allowing her to have day-time visits with Danny, and planning future overnights. However, only one overnight visit occurred, as Danny became distressed by the process. In July 2001, when Danny began to indicate increasing antipathy to visits with Irene A., DCF again reasonably limited visitation with his paternal grandmother in order to protect the child's emotional health.[42] (Testimony of Ellen M.) CT Page 10914
DCF was been aware that Irene A. and Joseph M. maintained phone contact even while the respondent father was incarcerated. The agency knew that Joseph M. and Irene A. often discussed Danny's future, and therefrom could have assumed that the adult mother and son had a close relationship. (Testimony of Ellen O-M.) However, even though Irene A. transported Danny to some prison visits with his father, the evidence is insufficient to support a finding that Joseph M. and Irene A. ever attempted intended to utilize the paternal grandmother attempted to utilize Irene A. to bridge the gap between father and son: the evidence does, however, support the logical inference that Irene A. wanted to be able to spend much more time with her beloved grandson. The impact of Joseph M.'s argument is further diminished by the fact that the respondent father has never applied to the court review of a request to increase his own access to Danny, or for modification of the limitations which DCF placed upon Irene A.'s contact with the child. Prior to the presentation of evidence in the TPR trial, Joseph M. had never specifically moved the court to order inclusion of Irene A. in the reunification process. Joseph M. is well aware that courts can render relief to parents who claim that access to their children is unduly restricted. He has personal experience in matters relating to the court's jurisdiction over visitation matters, and has, in the past, successfully applied to the Superior Court and obtained enlargement of visitation with his daughters Amanda and Cristina, who remained in their mother's custody during Joseph M.'s most recent period of incarceration. (Testimony of Debora D.) The Appellate Court has held that it is reasonable to expect a parent to attempt modification of extant visitation protocols. In reAlexander C., 67 Conn. App. 417, 425, 787 A.2d 608 (2001), cert. granted, 259 A.2d 927 (2002). In the view of this court, given Joseph M.'s experience with such matters, "to expect such an affirmative step on the part of the respondent does not require him to make "extraordinary and heroic efforts."' Id. However, any affirmative action by Joseph M. to include Irene A. in the reunification process is clearly absent from the pre-TPR trial facts of this case.
Irene A. has told DCF that she is has a personal interest in Danny's well-being.[43] (Exhibits A, B, C, D, G, K, P; Testimony of Ellen O-M.) Dr. Rogers performed court-ordered psychological evaluations of Irene A. in 1999 and 2001. His reliable and credible reports reflect that contrary to her overt expression of interest in obtaining custody of her grandson, "[Irene A.] conveyed appreciable passivity with regard to Danny . . . Her personal identify does not appear tied to being a parent, or grandparent . . . She seems proud of her grandson, but conveyed little understanding of him as an individual. There appears a troubling dynamicin their relationship insofar as, to protect her from upset, Danny may CT Page 10915 not tell her important things."[44] (Emphasis added.) (Exhibit 12.) In addressing Joseph M.'s claims that Irene A. should have been utilized in the reunification process, the court also finds it of concern that like her son, Irene A. has been personally involved with the criminal justice system, although she attributes her arrest to the wrongdoing of another person.[45] Such factors do not support for the proposition that Irene A. could serve as a reasonably effective resource for reunifying Joseph M. and his son.[46]
While Irene A. now indicates that she is able to care for not only Danny but his three younger siblings, the court notes the absence of evidence that this grandmother has any substantial familiarity with Tyler's special emotional needs, with that child, or with Alissa and Angela, either. Overall, the evidence does not reasonably support either the finding that Irene A. would have provided a viable means of reuniting Joseph M. with his son, or that she is functionally able to care for four energetic school and pre-school-aged children under the circumstances of this case.[47]
 III. STATUTORY GROUNDS FOR TERMINATION
As noted in Part II., in the adjudicatory phase the court properly considers circumstances and events which occur through the close evidence, for purposes of assessing the degree of rehabilitation, if any, the respondents have achieved.
III. A. SALLY S-P.'s FAILURE TO ACHIEVE § 17a-112 (j)(3)(B)REHABILITATION
The petitioner alleges that the respondent mother's parental rights should be terminated because she has failed to achieve rehabilitation within the meaning of § 17a-112 (j)(3)(B).[48] The allegations were uncontroverted at trial, and fully supported by the evidence. As Danny, Tyler, Alissa and Angela were all found to be neglected on November 30, 1999, the critical issue for this court is whether the respondent mother has thereafter achieved rehabilitation sufficient to render able to care for her four children. Applying the requisite legal standards,[49] and construing the statute in compliance with the mandate of § 17a-112 (p),[50] the court finds this issue in favor of the petitioner.
As found in Part I. A., despite due notice, the respondent mother has failed to appear at or to participate in these TPR proceedings. Accordingly, the court finds her in default. Pursuant to Practice Book § 34-2, establishing that Juvenile hearings are essentially civil CT Page 10916 proceedings, the default against Sally S-P. establishes admission of the material allegation in the petition, conclusively determining that the petitioner has prevailed on the sole TPR ground raised therein. Bank ofAmerica, FSB v. Franco, 57 Conn. App. 688, 693, 751 A.2d 394 (2000).
Furthermore, the petitioner has presented clear and convincing psychological evidence which establishes that she has met her burden of proving the alleged statutory ground for terminating Sally S-P.'s parental rights. As found in Part I. A., Dr. Rogers performed serial court-ordered evaluations of this respondent. Upon this basis, Dr. Rogers provided credible and reliable expert opinions establishing that during the adjudicatory period, Sally S-P. has not effectively improved even her ability to manage her own life, but has actually lost some of the coping and functional skills that she was able to demonstrate at her 1999 evaluation.[51] In re Gary B., supra, 66 Conn. App. 292; In re SarahAnn K, supra, 57 Conn. App. 448. In this regard, Dr. Rogers has extended his written opinion that "[d]espite repeated attempts, the mother has been unable to convincingly end her substance abuse, and she has not obtained adequate treatment for her characterological/psychiatric difficulties. Her presentation at [the 9/2001] evaluation suggested a decline, not improvement in functioning . . . [N]either history not observation provided compelling evidence of a change in her parenting." (Exhibit 11.)
Furthermore, as found in Part I. A., specific steps were imposed on Sally S-P. to guide her in her efforts at rehabilitation and reunification with her children, requiring her to refrain from substance abuse, and to avoid involvement with the criminal justice system. Nonetheless, the evidence clearly and convincingly reflects that Sally S-P. continued to use cocaine in violation of the steps and of Connecticut's penal code, and that she engaged in acts which led to her arrest for larceny and failure to appear while the steps were in effect.[52] (Exhibits 4, 11.) Sally S-P. has no appreciable awareness that Tyler, Alissa and angela require special educational support, or that Tyler and Danny have need of the individual counseling services described in Part I.E.
Under all these circumstances, the court finds, by clear and convincing evidence, that despite the provision of such reunification efforts as were reasonable in this case, Sally S-P. has not gained the ability to care for the particular needs of any of her children. In re Gary B., supra, 66 Conn. App. 292; In re Sarah Ann K, supra, 57 Conn. App. 448. As the evidence clearly and convincingly establishes that Sally S-P. has failed to achieve degree of personal rehabilitation as would encourage the belief that she could assume a responsible position in the lives of CT Page 10917 her children within a reasonable time, as contemplated by § 17a-112
(j)(3)(B), the petitioner has prevailed on this ground of the TPR petition against Sally S-P.
III. B. JOSEPH M.'S FAILURE TO ACHIEVE § 17a-112 (j)(3)(B)REHABILITATION
The petitioner alleges that Joseph M.'s parental rights should also be terminated because has failed to achieve rehabilitation within the meaning of § 17a-112 (j)(3)(B). Joseph M. counters that he has attended to the pivotal elements of the specific steps, and has made such progress in rehabilitation that he is ready and able to resume a responsible role in the life of his child. As Danny was found to be neglected on November 30, 1999, the critical remaining issue for this court is whether the respondent father has in fact gained the ability to serve as a parent for his son. In re Gary B., supra, 66 Conn. App. 292;In re Sarah Ann K, supra, 57 Conn. App. 448. Applying the requisite legal standards as described in Part III. B. and construing the statute in accordance with § 17a-112 (p), the court finds this issue in favor of the petitioner.
Several aspects of the clear and convincing evidence impel the determination that Joseph M. has yet to achieve a sufficient degree of rehabilitation with regard to his issues of poor judgment, lack of insight, impulsivity, and antisocial behavior as would encourage the belief that at some reasonable date in the future he could assume a responsible position in Danny's life. See In re Gary B., supra,66 Conn. App. 292; In re Sarah Ann K, supra, 57 Conn. App. 448. The court first notes the psychological evidence which clearly and convincingly establishes that Joseph M. has not achieved § 17a-112 (1)(3)(B) rehabilitation. The court fully credits the thorough and detailed psychological analysis and evaluations performed by Dr. Rogers in this matter, accepting and relying upon his cogent testimony at trial, the evidence presented through his written reports, and his relevant expert opinions. (Exhibits 11, 12.; Testimony of Dr. Rogers) Based on his skill, training, education, experience, and knowledge of the individuals involved in this case, Dr. Rogers tendered the clear and convincing opinion that although Joseph M. shows no signs of a major psychiatric illness, his traits of risk taking and limited ability or willingness to conform to authority render the respondent father markedly affected by his underlying personality disorder, which is similar to individuals who are formally diagnosed with Antisocial Personality Disorder. The court credits Dr. Rogers's opinion that Joseph M.'s psychological condition would seriously interfere with the respondent father's ability to serve as a responsible caretaker for a pre-adolescent child such as Danny. CT Page 10918 (Testimony of Dr. Rogers.) Upon review of the totality of the facts presented in this case, the court finds that Dr. Rogers's opinions regarding Joseph M.'s functional parenting deficiencies are logical and consistent with the independent evidence establishing that Joseph M. has repeatedly relied upon others to care for his children; that he has repeatedly engaged in criminal offenses despite the penalties imposed upon him; and that he persists in minimizing his criminal history and his manifest inability or unwillingness to abide by social norms or to provide a stable, secure home for a child.
In his interview with Dr. Rogers, when discussing his plans for assuming the role of Danny's caretaker, Joseph M. presented much idealism but little realistic understanding of the vicissitudes and stresses and inherent in parenting. The court credits Dr. Rogers's discomfiting finding that Joseph M. "seems to have formed little in the way of a parenting philosophy . . . [and] denied any of the frustrations common to parenting." (Exhibit 11.) The evidence as a whole provides scant basis for concluding that Joseph M. knows Danny as an individual, or that he has active interest in developing such information. Most troubling to Dr. Rogers and to the court, Joseph M. does not appear to accept any responsibility for the fact that his own poor choices and repetitive misconduct have caused him to be absent from his son's life for so many years, effectively depriving him of the opportunities to learn how to parent the Danny through hands-on experience.[53] Rather than admitting that his unlawfulness was a significant contributant to Danny's need for parenting by other persons, Joseph M. insists "that he has been discriminated against because of his criminal history."[54] (Exhibit 11.) Such an immature, unrealistic attitude is consistent with Dr. Rogers's ominous conclusion that despite the repeated probationary periods and incarcerations to which he has been exposed as penalties for his misdeeds, and despite his participation in rehabilitation programs while incarcerated, Joseph M. retains a severely limited tolerance for frustration, with concomitant limited insight, resistance to change, persistence in and adeptness at blaming others for his failings. (Exhibit 11; Testimony of Dr. Rogers.) Such factors impel the determination that despite the passage of more than two and a half years since Danny's adjudication as a neglected child, Joseph M. still has not acquired the self-understanding, information, or skills necessary to enable him to successfully parent a pre-adolescent boy who has significant emotional needs of his own.
The court further credits and accepts Dr. Rogers's reliable expert opinion that from a psychological perspective, Joseph M. will be unable to demonstrate whether he is able to serve as an appropriate caretaker for Danny until he has spent at least one year living in a lawful manner, CT Page 10919 without supervision from any external agency and without falling back into a pattern of violating the rights of others, alcohol abuse, or gambling. This length of time is required in view of Joseph M.'s inherent personality style, which renders him inconstant and unreliable on a long term basis, and makes him more prone than others to take excessive risks, such as engaging in unlawful behavior, that could place a child at harm and risk the permanence of the child's placement. (Testimony of Dr. Rogers.) While Joseph M. admitted that he would be subject to weekly scrutiny by his parole officer until June 14, 2002, he minimized the fact that thereafter he will remain subject to the conditions of probation for multiple years, as the result of the sentences imposed in 1998, notwithstanding Judge Parker's sentence adjustment. (Exhibit A-16; Testimony of Joseph M.) Given Joseph M.'s prolonged criminal history, his psychological condition, and his dependence upon others, there is no reasonable basis for foreseeing that, within an appropriate time in the future, he will be able to serve as an appropriate, responsible caretaker for Danny. In re Gary B., supra, 66 Conn. App. 292; In re Sarah Ann K, supra, 57 Conn. App. 448.
Second, the court finds that the empirical evidence clearly and convincingly establishes that Joseph M. has not yet achieved rehabilitation, within the meaning of § 17a-112 (j)(B)(3). As found in Parts I. B. and II. B., Joseph M. participated in a plethora of DOC-sponsored rehabilitation programs and mental health counseling while he was incarcerated from March 1998 through January 2002. (Exhibits Z, A-1a.) While Joseph M. claims to have reaped great benefit from those programs, the facts support the contrary conclusion, as the evidence clearly and convincingly establishes that this respondent continues to lack insight into the nature or implications of his behavior. For instance, as found in Part I. C., during the better part of his most recent incarceration, Joseph M. continued to act on impulse, violating DOC regulations notwithstanding the systematic imposition of penalties. By exhibiting this impulsive and self-destructive behavior, notwithstanding his program attendance as set forth in Exhibit Z, Joseph M. has demonstrated that he obtained little or no benefit from the multiple rehabilitative services he received in prison. Regrettably, the clear inference is that although he had earned all the certificates set forth in Exhibit Z prior to August 1999, the educational and training process has left his behaviors and attitudes without amelioration and largely unaffected during the remainder of his prison experience, and that he is unlikely to be able to make use of such lessons while living in the community.[55]
Other clear and convincing empirical evidence establishes that Joseph M. has not yet achieved valid insight into his own personality and CT Page 10920 behavior issues, a critical feature of progress in rehabilitation. His lack of insight and self-awareness is illustrated by the consistent evidence of occasions when, to serve his own ends, Joseph M. repeatedly minimizes the seriousness of his alcohol dependency and compulsive behaviors, his criminal history, and his inability or unwillingness to respect authority. As found in Part I. B., in addressing the court, he minimized the nature of his most current convictions, insisting that he was arrested for minor offenses such as trespassing, without adequately acknowledging that his felony sentence was due to the status he had acquired as a persistent larceny offender. In addition, Joseph M. was not forthcoming in describing his criminal history to Dr. Rogers at his evaluation in the fall of 2001. Apparently unaware that the psychologist would discern his pattern of involvement with the criminal justice system, Joseph M. glossed over the salient features of this significant part of his life: from this, Dr. Rogers concluded that Joseph M. intentionally "sought to present himself as obliging, even obsequious, and improbably naive." (Exhibit 11; testimony of Dr. Rogers, Joseph M.) Similar to his presentation with Dr. Rogers, through his trial testimony and demeanor, it was apparent to the court that Joseph M. depicts himself to others as being thoughtful, cooperative, and law-abiding, without any recognition of all the evidence to the contrary.[56]
In contrast to the self-portrait Joseph M. seeks to portray, the evidence clearly and convincingly reflects that he is not law-abiding or functionally independent by nature or practice. Joseph M. is even unable to peacefully co-exist with his living companions, having been involved in multiple incidents of domestic violence with Debora D., the mother of his daughters, and having engaged in pseudo-domestic discord with a cellmate while incarcerated. (Testimony of Debora D., Joseph M.) Historically, he has failed to obey court-ordered conditions of probation, and has violated a criminal protective order issued by the court.[57] He has failed to maintain lawful, long-term employment, due to his return to prison. Nearly thirty years of age, Joseph M. has spent the better part of the past ten years either committing crimes, or living in facilities sponsored by the DOC. He has never maintained independent housing that is suitable for him alone, nor for him and his young son. When at liberty, he lives with his mother and stepfather, allowing them to assist in his support.[58] (Testimony of Joseph M.) Joseph M. remains willing to continue to depend upon others to establish structure in his life, and lacks the ability or willingness to progress or to move on in a positive manner. The evidence thus clearly and convincingly establishes that both psychologically and experientially, Joseph M. is unable to leam from the past, consistent with Dr. Rogers's credible caution that the respondent father's conduct, ill-suited for a parent, is not likely to change in a reasonable period, so that he will likely CT Page 10921 remain unable to assume a responsible role in Danny's life during the foreseeable future.[59]
Third, although specific steps were assigned to assist Joseph M. in achieving rehabilitation, the evidence clearly and convincingly indicates that he failed to fulfill a number of significant measures. The specific steps a required Joseph M. to participate in parenting counseling, to assist him in developing appropriate methods of managing and understanding his son's needs. Joseph M. concedes that he has failed to adequately comply with this step, but contends that any failure to obtain parenting education was due to the limited availability of relevant classes during his incarceration from March 1998 to January 2002. (Testimony of Joseph M.) Even if such programs were not available through the DOC, as discussed in Part II. A., Joseph M.'s his failure to complete this aspect of the steps is clearly due to his own violations of the law, which led to his prolonged incarceration, and cannot be attributed to any unreasonable efforts on the part of DCF. During his most recent period of incarceration, Joseph M. failed to keep DCF adequately apprised of his whereabouts, to the detriment of the his visitation schedule with Danny. Furthermore, as found throughout, it is clear that Joseph M. has either disregarded the lessons he has leamed through his programs or his counseling, or that he is unable or unwilling to apply them outside of the DOC classroom, as notwithstanding all his classes, his behavior while incarcerated indicates that he remains unable to control his anger, or to peaceably resolve conflicts.[60]
While Joseph M. argues that he has met his own measure of rehabilitation by completing his sentence and earning his release from prison, the court finds this argument to be without merit.[61] Joseph M.'s personal opinion conflicts with the clear and convincing evidence establishing that he remains subject to a lengthy period of probation, imposed for the ostensible purpose of conducting his rehabilitation.[62]
(See Exhibit A-16.) In further assessing the value of Joseph M.'s insistence that he is rehabilitated, and that since he is no longer incarcerated he can now serve as a valid caretaker for his son,[63] the court acknowledges the respondent father's candor in admitting that his criminal history is "not good, " that he has had difficulty responding to authority figures in the past, and that he was in prison during the majority of Danny's early years. The court also remains mindful of Dr. Rogers's credible, clear and convincing opinion that the respondent father's actual capacity to serve as a responsible parent for Danny cannot be determined until he has spent one full year living in the community, utilizing appropriate resources for support and sustenance, and abiding by the laws that govern our society. (Testimony of Dr. Rogers.) In ascertaining that Joseph M. has demonstrated but a minimal CT Page 10922 degree of rehabilitation through his discharge from prison, the court has applied the principle that in child protection matters such as this, the critical issue is not whether a respondent father has improved his ability to manage his own life, but rather whether he has gained the ability to care for Danny's particular needs. In re Sarah Ann K., supra,57 Conn. App. 448; In re Shyliesh H., supra, 56 Conn. App. 180. This child's psychological and emotional conditions render him an inappropriate candidate for waiting any longer for Joseph M. to full the one-year measure, for purposes of reliably determining whether Joseph M. has achieved rehabilitation. (Testimony of Ashley S., Dr. Rogers.)
Thus, in its totality, the clear and convincing evidence compels the determination that despite some participation in a rehabilitation regimen, Joseph M. remains without the qualities necessary to successfully parent Danny, and that the respondent father lacks the ability to assume a responsible position in his son's life within a reasonably foreseeable time in the future. In re Gary B., supra,66 Conn. App. 292; In re Sarah Ann K., supra, 57 Conn. App. 448. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved the allegation of failure to achieve rehabilitation pursuant to § 17a-112 (j)(3)(B), pending against Joseph M.
IV. SUMMARY OF FACTS TO SUPPORT TERMINATION OF PARENTAL RIGHTS
Joseph M. has asserted that for purposes of proving the pending statutory ground of failure to rehabilitate, the petitioner was, as a matter or law, limited to proof of the events and circumstances set forth in the Summary of Facts to Support Termination of Tarental Rights (the summary) which accompanied the TPR petition filed on March 27, 2001. (Court Exhibit 4) The respondent father argues that because the summary merely referenced Joseph M.'s incarcerated status, without specifying his failure to pursue a particular rehabilitative process, the court was obliged to disregard any facts relevant to Joseph M.'s status at times other than during his imprisonment from March 1998 through January 8, 2002, when he was released on parole.[64] For the following reasons, the court declines to accept the respondent father's argument, and finds the issue in favor of the petitioner.
From a procedural standpoint, Joseph M.'s argument effectively claims that there was a discrepancy between the facts set forth in the pleadings and the facts asserted at trial. The respondent father did not file a preliminary motion seeking to address this issue before the start of trial. The issue was formally presented after completion of the evidentiary case in chief.[65] If the respondent father's argument was CT Page 10923 honored, the court could consider only the evidence presented on the three days of trial that took place in December 2001, prior to his discharge from DOC custody. The court would be have to disregard and nullify relevant and material facts that were presented on the three trial days that occurred thereafter. Connecticut court procedures do not countenance such a result in a matter of a civil nature such as this TPR proceeding.
Practice Book § 32-1 indeed establishes the petitioner's duty at the commencement of a case to set forth issues and facts that will be asserted at trial.[66] However, during the first three days of trial, which occurred while the respondent father was still serving his sentence, it was reasonable and logical for the petitioner to present proof focusing upon his incarcerated status and the causes therefore, in an effort to show that he had not achieved rehabilitation.[67] On January 8, 2002, when Joseph M. was released on parole, facts were effectively created that had not been described in the summary. However, on the three trial days thereafter, the respondent-father presented his own case, with self testimony, testimony from Debora D. and Irene A., and documentary evidence. Thus, the TPR petition and summary accordingly remained accurate and sufficient throughout the petitioner's presentation of evidence in support of the failure to rehabilitate allegation: any change in the factual circumstances of the case related only to Joseph M.'s discharge from incarceration, an event which occurred after the case had commenced.
Our long-honored court protocol establishes that "[t]he proper way to attack a variance between pleading and proof is by objection at the trial to the admissibility of that evidence which varies from the pleading, and failure to do so at the trial constitutes a waiver of any objection to such variance. . . . A variance is a departure of the proof from the facts as alleged. . . . Only material variances, those which disclose a departure from the allegations in some matter essential to the charge or claim, warrant the reversal of a judgment. . . ." (Quotation marks omitted.)Tedesco v. City of Stamford, 215 Conn. 450, 461, 576 A.2d 1273 (1990). See also Pepe v. City of New Britain, 203 Conn. 281, 285-86, 524 A.2d 629
(1987); Waterbury Petroleum Products Inc. v. Canaan Oil and Fuel Co.,193 Conn. 208, 223-224 n. 16, 477 A.2d 988 (1984).
Accordingly, at law, variances between facts raised in the pleadings and facts raised at trial are allowed if the opposing party does not object to the variance at trial. Here, Joseph M. may not raise the issue of variance at final oral argument when the facts at issue were neither the subject of a relevant pretrial motion, nor adequately objected to during the presentation of the petitioner's case in chief. In reaching CT Page 10924 this determination, the court has honored the venerable axiom that "[o]ur rules of practice are designed "to have all formal and technical objections made known as early as practicable, so that the plaintiff may amend or proceed anew, and the parties may, as expeditiously and inexpensively as possible, reach and settle their controversy upon its merits.' Donaghue v. Gaffy, 53 Conn. 43, 52 (1885)." Bombero v. Planning Zoning Commission, 40 Conn. App. 75, 86, 669 A.2d 598 (1996). By not raising a timely objection, the defense failed to notify the plaintiff in time to amend their pleadings: he therefore may not benefit from his claim at this stage of the proceedings.
Furthermore, under the circumstances of this case, where Joseph M. had remained incarcerated throughout the entirety of the period following Daniel M.'s adjudication as a neglected child, through the presentation of the petitioner's case and until the midst of trial any variance between the TPR petition and the summary must be reasonably construed as immaterial, not fatal to the action.[68] On its face, the TPR petition and the summary provide due notice of the factual basis for the allegation that Joseph M. had failed to achieve rehabilitation sufficient to allow him to assume a responsible role in the life of his child. The summary makes clear reference to Joseph M.'s incarceration as a sentenced prisoner during the adjudicatory period: from this statement of facts, it is reasonable for the respondent father to have known that the nature of the sentence being served, the criminal behavior leading up to the underlying conviction, and his related criminal history and conduct would all be the subject of evidence presented to the court at the TPR trial. It is further reasonable for the respondent father to have known that the events and circumstances of Joseph M.'s incarceration would be the subject of trial evidence, given the occurrence and results of Dr. Rogers court-ordered psychological evaluation, which took place during the period of incarceration, along with evidence related to the locus of Joseph M.'s imprisonment and the misconduct he exhibited while in the custody of the DOC.
The respondent father has acknowledged the spirit and intent of the principles which guide contemporary courts in reasonably reading a TPR petition and summary like that at issue, so as to permit the full adjudication of the pending child protection: "`The modem trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically.' . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party ["we will not conclude that the complaint is insufficient to allow recovery.]'Normand Josef Enterprises v. Connecticut National Bank, 230 Conn. 486,496 ["646 A.2d 1289] (1994)." Respondent's Memorandum. "This approach CT Page 10925 complements Practice Book § 35-1(a), which states [in pertinent part] "[a]ll petitions and motions shall be liberally construed in the best interest of the child."' Respondent's Memorandum.[69]
Using that liberal, best interests construction, "a review of the petition itself supports the conclusion that the respondent was on notice of the . . . allegations against [him]" in the instant case, as in In reMichael M, 29 Conn. App. 112, 120, 614 A.2d 832 (1992), upon which the respondent father relies. Without condoning the summary's tersely phrased references to Joseph M., it is important to note that in this case the petitioner has presented evidence solely in support of the ground of failure to achieve rehabilitation, as specified on form JD-JM-40. (Court's Exhibit 4.) The petitioner has submitted no new or additional grounds, such as parental act or acts of omission or commission or lack of an ongoing parent-child relationship, for the court's consideration and review. As she focused upon the respondent father's long-term incarcerated status, and the circumstances and events that brought him to that condition and effect him still, it is clear that the petitioner has not subjected Joseph M. to any "surprise or prejudice" as contemplated byNormand Josef Enterprises v. Connecticut National Bank, supra,230 Conn. 496.
Construed in the best interests of the child, the court finds the allegation stated in the TPR petition, with the reference to Joseph M. contained in the summary of adjudicatory facts, to provide a legally sufficient, "plain and concise statement of the material facts on which the pleader relies, but not of the evidence by which they are to be proved. . . ." Practice Book § 10-1. The facts and circumstances of this litigation created no conditions which mandated amendment of the TPR petition or any incorporated document, as contemplated by Practice Book § 35-1(c), and no pretrial motion therefor was submitted by Joseph M. Under any construction, the length of time expended in the trial of this case, which afforded Joseph M. an opportunity to experience release from incarceration, to enter a parole status preparatory to commencing probation, also gave the respondent father ample time in which to respond adequately to any facts which he found to be "additional or changed" from the TPR petition and summary.[70] Accordingly, the court declines to grant Joseph M. the relief here requested.
 V. DISPOSITION
As statutory grounds for termination have been proved to exist as to Sally S-P. and Joseph M., and as Alan P. has tendered a valid consent to TPR, the court next "must determine whether termination is in the best interests of the [children]" at issue in this case.[71] (Citation and CT Page 10926 quotation marks omitted.) In re Quanitra M., supra, 60 Conn. App. 103. In this dispositional phase, the court has considered the evidence and testimony related to circumstances and events through the close of evidence. Practice Book § 33-5.
V. A. SEVEN STATUTORY FINDINGS
The court has made each of the seven written factual findings required by General Statutes § 17a-112 (k) based upon the clear and convincing evidence presented at trial, and has considered the evidence relevant to each of these findings in deciding whether to terminate parental rights. See In re Jonathon G., supra, 63 Conn. App. 528.[72]
 V. A. 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112(k)(1)
As set forth in Parts I. A. and II. B., and as fully described in Exhibit 1, multiple timely and appropriate services were provided for Sally S-P. during the course of her involvement with DCF. The respondent mother was referred to Care Plus, SCADD and CMHSSC for substance abuse evaluation and treatment and to visitation sessions and parenting education provided through the Smith Bent program. Intensive Family Preservation services were provided prior to the childrens' removal from her home and transportation to visitation was extended. Sally S-P. was offered individual therapy at Care Plus and CMHSSC, and family support services through the Thames River Family Program. (Exhibit 1.) On December 19, 2000, as previously found, the court ruled that reunification efforts were no longer appropriate for Sally S-P., and this court has found in Part II. B. that Sally S-P. is unable or unwilling to benefit from such services.
As discussed in Part I. B. and II. C., Joseph M. was incarcerated from the inception of Danny's DCF custody until the midst of the TPR trial. During this period, he was provided with multiple timely and appropriate services through the DOC including individual counseling, academic instruction, the TIER I sessions and other programs designed to address his addiction problems, although he had no access to parenting programs. (Exhibit 1; Testimony of Joseph M., Ellen M.) The court has found that while Joseph M. was incarcerated in Connecticut, reasonable visitation services were provided finds by DCF, and that such services would not be reasonable when his whereabouts were unknown or when he was relegated to imprisonment in a Virginia correctional facility. Furthermore, as found in Part II. C., Joseph M. has been found unwilling or unable to benefit from reasonable reunification efforts. CT Page 10927
V. A. 2. REUNIFICATION EFFORTS PURSUANT TO FEDERAL LAW — §17a-112 (k)(2)
DCF made such reasonable efforts to reunite the family as were required by the federal Adoption Assistance and Child Welfare Act of 1980, as amended, under the circumstances of this case. As found in Part V. A. 1., DCF offered appropriate services and sufficient time for Sally S-P. to reunify with her children. While DCF had no capacity or obligation to extend such services to Joseph M. during his incarceration, similar services were provided through the DOC. Furthermore, as found in Parts II. B. and C., both parties have been found unwilling or unable to benefit from reasonable reunification efforts as contemplated by federal law.
V. A. 3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (k)(3)
Although she attended some service sessions, Sally S-P failed to adequately comply with the specific steps ordered on November 30, 1999. Among other things, the steps required her to forgo substance abuse, to complete drug treatment and parenting programs, and to maintain stable housing. In violation of the steps, Sally S-P. continued to use cocaine, and she failed to fully cooperate with the majority of the treatment programs to which she was directed. She failed to fully take advantage of the parenting instruction and counseling that was provided, and neither secured nor maintained adequate housing. (Exhibits 1, 4.)
Joseph M. attended some services sponsored by the DOC, earned some lawful income while he was incarcerated, and obtained adequate housing for himself by moving in with his mother when he was released on parole, in partial compliance with the specific steps ordered on November 30, 1999. However, as discussed in Part II. B., this respondent failed to adequately comply with the steps' requirement that he timely advise DCF of a change in his whereabouts. Furthermore, through his accumulation of multiple "tickets" from the DOC while the steps were in effect, Joseph M. is found to have violated the prohibition against further involvement with the criminal justice system.
V. A. 4. THE CHILDREN'S FEELINGS AND EMOTIONAL TIES — § 17a-112(k)(4)
To the two older children at issue in this case, before their entry into foster care, Alan P. occupied the familiar father-figure role. Dr. Rogers has written that from the children's psychological standpoint, Alan P. "is more than simply a familiar adult, and all of the children, including Danny, seem to accord him a special role . . . [H]e certainly is aCT Page 10928father figure for Danny . . ." (Emphasis added.) (Exhibit 11.) All of the children, including his step-son Danny, have long-referred refer to Alan P. as "daddy." (Exhibit 11; Testimony of Holly P.) For the younger children, Alissa and Angela, Alan P. "is clearly a recognized and valued play partner" although they do not identify him as a father figure. (Exhibit 11.)
Danny is reasonably comfortable in the presence of Joseph M, enjoys visiting and is sometimes excited to see him. (Exhibit O; Testimony of Ashley S.) Despite his time under Irene A.'s care, Danny actually knows but little about his biological father, and he has been curious about Joseph M.'s prison experiences. However, Danny relates to the respondent father merely "as an interested adult:" Joseph M. does not serve as a father figure for the child, and he is not viewed as a psychological parent.[73] (Exhibit 11.) Overall, there are minimal emotional ties between Danny and Joseph M. As Dr. Rogers has credibly opined: there is "little to suggest a meaningful bond between Danny and his biological father . . ." (Exhibit 11; see also Testimony of Dr. Rogers.)
While Danny tolerates visits with Irene A. and enjoys seeing her, she admits that the child seems "somewhat uncomfortable at their visits." (Exhibit 11.) Danny's bond to his paternal grandmother appears to be based on his appreciation of the role she played as his caretaker in past years, rather than upon any extant emotional tie.[74] (Exhibit 11; Testimony of Ashley S.) For Danny, Irene A. "is clearly not a parent figure." (Exhibit 11.)
Despite the years he has passed in foster care and the progress he has made in avoiding his previously-parentified behaviors, Danny continues to identify Sally S-P. as his psychological mother. (Testimony of Dr. Rogers, Ashley S.) Tyler remains ambivalent about his status as a foster child, and is confused about his parentage. However, while he still seems to long for parenting by Sally S-P. and Alan P., "[i]t is in his foster mother's presence that he achieves the greatest personal control and apparent calm." (Exhibit 11.) For Alissa and Angela, Holly and Daniel P. serve as psychological parents and primary parental figures, although they recognize their biological parents as valued play partners. (Exhibit 11; Testimony of Dr. Rogers.)
All four children are bonded to each other, and desire to remain in a home living together: separating any one child from the others would unreasonably stress their healthy emotional ties. (Testimony of Ellen M., Dr. Rogers.) The childrenhave warm and loving feelings toward their foster parents, Holly and Daniel P., who love the children and would like to adopt them all. (Testimony of Ellen M., Holly P.) CT Page 10929
V. A. 5. AGES OF THE CHILDREN — § 17a-112 (k)(5)
Danny was born February 1991 and is eleven and a half years old. Tyler was born July 1996 and is six. Alissa was born on May 1997 and is five. Angela was born August 1998 and is four years old.
V. A. 6. PARENTS' EFFORTS TO ADJUST THEIR CIRCUMSTANCES — §17a-112 (k)(6)
Neither Sally S-P. nor Joseph M. has not maintained adequate contact with their children, with the foster parents or with DCF regarding the status of the children at issue. Neither respondent has made realistic and sustained efforts to conform his or her conduct to even minimally acceptable parental standards during the lengthy adjudicatory period. Giving them additional time would not likely bring their parental performance sufficiently within acceptable standards so as to render reunification in the children's best interests.
 V. A. 7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING RELATIONSHIPS WITH THE CHILDREN — § 17a-112 (k)(7)
Neither Sally S-P. nor Joseph M. was prevented from maintaining a meaningful relationship with any child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent. As found in Part I. A., Sally S-P. was provided with access to rehabilitation services, including visitation and transportation thereto, although she failed to tale adequate advantage of these means for maintaining close ties with her children.
Joseph M. claims that by limiting Irene A.'s visitation with Danny, DCF unreasonably interfered with the maintenance of his own relationship with the child. This argument must fail for a number of reasons. First, it erroneously presumes the existence of a relationship between father and son, other than the biological bond, which was subject to preservation. As found in Parts I. B. and C., Joseph M. has never realistically been available to establish a meaningful connection between himself and Danny. In the past, he has elected to live with his daughters instead of his son, and he has engaged in repeated criminal activity which kept him incarcerated and out of Danny's life for prolonged periods of time: this has resulted in the effective absence of any emotional tie from the child to his father, other than that of acquaintanceship. (Exhibit 11; see also Testimony of Dr. Rogers.) As found in Part V. A. 4., Danny had never seen Joseph M. as a father figure, as this position was always occupied by his CT Page 10930 step-father Alan P. (Exhibit 11; Testimony of Dr. Rogers.)
Second, viewed objectively, the evidence fails to reveal the extent to which the provision of visits between Irene A. and Danny would have promoted the maintenance of a relationship between the respondent-father and his son. As found in Part II. D., there is no evidence that could reasonably support the conclusion that Irene A.'s visits with Danny would have, to any degree of probability, advanced a relationship between Joseph M. and his child. The evidence fully fails to support any finding that Joseph M. and the paternal grandmother intended or adequately attempted to utilize Irene A. as a conduit between father and son, during the period between the adjudication of neglect and Joseph M.'s release from incarceration. Other than Irene A.'s transportation of Danny to visit his father in prison during the period of 1995 through 1997, and on April 18, 2001, the evidence fails to disclose how, if at all, Irene A. used her other visits with Danny to foster the father-son bond. Thus, there is no basis present in this case for concluding, by any standard of proof, that increased visits between Irene A. and her grandson would in any way have furthered the father-child connection.
Third, Joseph M. claims that DCF unreasonably interfered in his maintenance of a relationship with Danny by honoring Sally S-P.'s request that Irene A. be prevented from visiting the child after the spring of 2000.[75] As found in Parts I. A. and II. B., Sally S-P. had asked for this limitation to be imposed, while Danny was in foster care, in an effort to enhance the reunification process and maintain the intact mother-son bond without allowing Irene A. to resume the maternal role she had played while serving as Danny's guardian some years before. (Exhibit Q.) Under the circumstances of this case, the court finds DCF's accession to Sally S-P.'s wishes to be reasonable, based upon the best interests of the child who was the object of reunification efforts which were ongoing until December 19, 2000. The court further finds that DCF's actions in limiting the grandmother's contact with the child, in response to the mother's expressed desire, was consistent with the evolving law affecting third party visitation.
In considering this issue, the court has found guidance in two recent cases, Troxel v. Granville, 530 U.S. 57, 530 U.S. 57, 120 5. CT. 2054,147 L.Ed.2d 49 (2000) and Roth v. Weston, 259 Conn. 202, 789 A.2d 431
(2002). In Troxel v. Granville, the United States Supreme Court confirmed that parents have a due process interest in caring for and deciding what was best for their children. Therefore, Washington state's laws allowing grandparents to visit the children should have conformed to this constitutionally protected interest, and were flawed through their presumption that such visitation is in the best interests of the children CT Page 10931 at issue.[76] In Roth v. Weston, where maternal relatives sought visitation rights with the father's minor children, the Connecticut Supreme Court applied the Troxel analysis to Connecticut law. Measuring the constitutionality of visitation permitted under General Statutes § 46b-59, the court emphasized a parent's fundamental right to direct the upbringing of her children, even though third parties such as grandparents might be excluded from visits. The Roth v. Weston court held that to secure visitation, a third-party applicant must prove by clear and convincing evidence that the applicant has a relationship with the child that is similar to a parent child relationship, and that the denial of visitation would cause "real and significant harm to the child."[77]
Id., 235.
As both Troxel and Roth deal with parent-caretakers who may be assumed to be fit custodians, the decisions are not precisely applicable to the present case. However, the lessons of both Troxel and Roth inform the court's determination that DCF acted reasonably in honoring Sally S-P.'s desire to preserve her own relationship with Danny by minimizing his exposure to a grandmother who had served as the child's custodian in the past. It is abundantly apparent that Sally S-P. had served as Danny's caregiver from February 1997 through January 2000; that Danny long thereafter regarded Sally S-P. as his psychological mother, to the exclusion of his prior caretaker Irene A.; and that DCF has a statutory obligation to provide reasonable parent-child reunification efforts without interference from third parties. Under all these circumstances, it was appropriate and prudent for DCF to focus on affirming the bond between biological mother and son, without risking a disturbance of that relationship by inserting the maternal grandmother into life of a child who was already confused by his status in foster care. Moreover, if theTroxel/Roth analysis is found to be particularly apt to this case, the evidence is insufficient to establish either that Irene A. had a parent-child relationship with Danny which was of such recent vintage that it fell within the Roth measure, or that denying Danny substantial contact with his grandmother would cause the child to suffer either emotional or physical harm. Clements v. Jones, supra,71 Conn. App. 694.[78] Based on the foregoing, this court finds that DCF did not unreasonably interfere with the relationship of Joseph M. and Daniel M. by limiting the child's visitation with his paternal grandmother, Irene A.
V. B. BEST INTERESTS OF THE CHILDREN — § 17a-112 (j)(2)
The court is next called upon to determine whether terminating the parental rights of Sally S-P., Alan P. and Joseph M. would be in the best interest of their respective children.[79] Applying the appropriate CT Page 10932 legal standards to the facts which are clearly and convincingly apparent in this case,[80] the evidence clearly and convincingly establishes that it is not the children's best interests to continue to maintain any legal relationship with their biological parents. Sally S-P. has been defaulted, and demonstrated her lack of interest in the outcome of this matter by failing to attend any sessions of the trial. Her continuing battles with substance abuse and mental health issues render her an inappropriate caretaker for the children at issue. Alan P. has consented to termination of his parental rights. As to Joseph M., despite his vigorous protests to the contrary, clear and convincing evidence proves that he has not achieved rehabilitation and that he has never had an effective parent-child relationship with Danny, having previously ceded care of this child to others either by choice or because he was incarcerated for years at a time. Under the circumstances of this case, taken as a whole, the court finds that the children's best interests will be served by termination of the parental rights at issue.[81]
While Sally S-P. has, in the past, "expressed a seemingly sincere and affectionate regard for her children, " the evidence clearly and convincingly reveals that her offspring would not be neither safe nor secure in her care.[82] (Exhibit 11.) As found in Parts I. A. and II. B., from March 2001 to the time of trial, Sally S-P. has been unable to maintain adequate housing, unable to achieve control over her substance abuse and mental health issues, and has failed to even advise responsible parties of her address. (Testimony of Ellen M.) Accordingly, the court determines that notwithstanding the children's continued affection for their biological mother, their best interests cannot be served by allowing Sally S-P. to serve as a placement resource in any regard.
As to Alan P., Dr. Rogers's serial psychological evaluations provided strong indication that the respondent is affected by traits like those of persons with Antisocial Personality disorders, and that he has very limited insight into his personal or family situations:[83] these are disturbing characteristics factors when considered in the context of providing parenting services for young children who are unable to defend themselves without assistance and support. While he has some parenting skills, the evidence clearly and convincingly establishes that these skills are limited in their application, because Alan P. was unable or unwilling to accept any responsibility for his role in causing or allowing stress and domestic violence to affect his home. (Exhibit 11.) However, through his consent to termination of his parental rights, Alan P. has courageously indicated his awareness that the best interests of Tyler, Alissa and Angela will be served by allowing them to be raised by loving, nurturing adoptive parents, such as Holly and Daniel P., who can ensure their health and safety along with the well-being of their brother CT Page 10933 Danny. This court concurs.
In assessing Danny's best interests with regard to Joseph M., on balance the evidence clearly and convincingly reflects that there will be no justifiable benefit to him, but that he will likely be subject to harm, if he is now returned to his biological father's care, or if he is caused to wait any additional time before a decision on permanency is rendered.[84] Pamela B. v. Ment, supra, 244 Conn. 313-314 (child's physical and emotional well-being must be weighed against the interest in preserving family integrity). As found in Part III. B., Joseph M. has not achieved rehabilitation; crediting the expert psychological opinion tendered by Dr. Rogers and evaluating the respondent father's history of repetitive involvement with criminal activity and incarceration, the evidence clearly and convincingly proves that the respondent father will not assume the capacity to safely parent Danny within a reasonable period of time, given Danny's state of confusion concerning his foster care status, his age and sensibilities. Rather, abundant evidence establishes that Danny's needs will best served by allowing him to remain placed with his half-siblings in the foster home which has served all the children's needs so well for the past two and a half years. As Dr. Rogers has credibly opined, the continued process of living as a family unit with Tyler, Alissa and Angela is fundamental to ensuring Danny's healthy emotional growth and positive overall development.[85] (Exhibit 11; Testimony of Dr. Rogers.)
It is apparent that Joseph M. is disturbed by the distance that has developed between him and Danny during the past years. (Testimony of Joseph M.) However, the evidence clearly and convincingly reflects that Joseph M. remains unable or unwilling to recognize that this situation has developed as the result of his own actions and lifestyle choices. The evidence reflects that Joseph M. paid little effective attention to Danny during the period of his most recent incarceration, which largely coincided with the adjudicatory period, yet he has no insight into the fact that his demonstrated lack of interest in the child had adversely affected their relationship.[86] Joseph M.'s expressed intention to live with Irene A. supports the inference that if Danny resides there, he will be parented by his paternal grandmother who adores the child, and not by his biological father. The respondent father has no care plan which is adequate to meet either Danny's current emotional needs, or the significant psychological harm he would suffer upon removal from the foster home where he has happily and securely lived with Tyler, Alissa, Angela and his foster family for the past two and a half years.[87]
(Testimony of Dr. Rogers, Joseph M.) Under the totality of the s, based on clear and convincing evidence, the court finds that Danny's best interests will not be served if he is returned to the nominal care of CT Page 10934 Joseph M.
Danny's attorney has vigorously participated in the pre-trial sessions and at the trial itself. She has urged the court to honor Danny's representations that he desires to be reunited with Joseph M. and to restore close ties with Irene A. While the court has fully considered the value of the position statements Danny has made to his lawyer, the value of such expressed desires are far outweighed by the contrary opinions consistently rendered by the mental health care professionals who testified in this case: Dr. Rogers, the court-ordered psychological evaluator, and Ashley S., Danny's skilled and experienced social worker therapist. The evaluating psychologist and Danny's therapist have reached the same, compelling conclusion: even if Danny has stated that he wishes to maintain contact with Sally S-P., Alan P., Irene A. and Joseph M., the child's best interests cannot be met by returning him to the respondent father's care.[88] (Testimony of Dr. Rogers, Ashley S.) Furthermore, it is not in Danny's best interests to allow a period of time in order to establish or redevelop a bond between the child and his biological father. (Testimony of Dr. Rogers.) Instead, the clear and convincing evidence proves that Danny's needs will be met by terminating his legal relationship to Joseph M., eliminating continuing apprehensions about his status as a foster child, allowing him to remain in residence with the other children who are the subject of this petition, and facilitating his adoption by Holly and Daniel P.
Like Danny, removal of any of the younger children from their present foster home would have a deleterious effect upon them, robbing them of the valuable ability to trust adults that they have gained while living with Holly and Danny P. Continued placement with Holly and Daniel P. would serve all the childrens' best interests, as they each have a profound need for continuing the nurturing relationship they have developed with these adults, who have assumed and fulfilled all requisite caregiving roles, relieving the Danny of the obligation to take on a caregiving role he should not have had to shoulder in the past. (Testimony of Dr. Rogers, Ashley S.) This conclusion is firmly supported by the evidence showing that the foster parents are dedicated and skilled caretakers, who are viewed by all four of the children as the heads of their healthy, harmonious family unit.[89] They respect Danny's feelings about Sally S-P. and Alan P., Joseph M. and Irene A.: the foster parents are magnanimous in their willingness to allow the children to remain in contact with their birth family members, further evincing their desire to serve the children's best interests, even while inconveniencing themselves. (Exhibit 1; Testimony of Dr. Rogers, Ellen O-M., Holly P.)
Our courts have recognized that "long-term stability is critical to a CT Page 10935 child's future health and development." In re Eden F., supra,250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see also In re JuvenileAppeal (84-CD), 189 Conn. 276, 292, 455 A.2d 1313 (1983). With regard to Danny, it is clear that long-term foster care will not serve the child's best interests. Only a permanent determination with regard to issues affecting his parents can relieve the child of the stress and worry inherent in the potential for re-eruption of those maters in another legal battle. Indeed, having the knowledge that his current placement is a permanent one will foster the child's development, allow him to continue to benefit from the trusting relationship he has developed with Holly and Daniel P., and which he has never experienced before this placement. (Testimony of Dr. Rogers, Ashley S.)
Upon due deliberation, having balanced the children's intrinsic need for stability and permanency against the benefits of maintaining a connection with Sally S-P., Alan P., or Joseph M., the clear and convincing evidence in this case establishes that each child is entitled to the benefit of ending, without further delay, the uncertainty of the issues raised through this litigation. Pamela B. v. Ment, supra,244 Conn. 313-314. Accordingly, by clear and convincing evidence, and based upon all of the foregoing, the court finds that termination of the parental rights of Sally S-P. and Joseph M. is in the best interest of the child Danny, and that termination of the parental rights of Sally S-P. and Alan P. is in the best interest of the children Tyler, Alissa and Angela, as contemplated by § 17a-112 (j)(2).
 VI. ORDER OF TERMINATION
WHEREFORE, after due consideration of the children's sense of time, their need for a secure and permanent environment, the relationship they have with their biological and foster parents, and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the children's best interests, the court issues the following ORDERS:
That the parental rights of Sally S-P. and Joseph M. are hereby terminated as to the child Danny M.
That the parental rights of Sally S-P. and Alan P. are hereby CT Page 10936 terminated as to the children Tyler, Alissa and Angela.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for these children for the purpose of securing an adoptive family or other permanent placement for them, and that primary consideration for adoption of the children shall be offered to their current foster parents
That a permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court, as required by law.
BY THE COURT,
_________________ N. Rubinow, J.
[2] The court adopts the diminutive by which the child is generally known.
[3] As set forth in footnote 34, additional evidence was received on June 11, 2002.
[4] On November 27, 2001, the court (Driscoll, J.) denied the Motion for Appointment of a Guardian Ad Litem which Danny's counsel had filed on his behalf. (Court Exhibit 2.)
[5] On December 13, 2001, a default was issued against the respondent mother. Her counsel was excused from further attendance at trial. See Part 1. A.
[6] The Social Study for Termination of Parental Rights was submitted in evidence as Exhibit 1. Practice Book § 33-5.
[7] "It is well established that in cases tried before courts, trial judges are the sole arbiters of the credibility of witnesses and it is they who determine the weight to be given specific testimony." In reAntonio M, 56 Conn. App. 534, 540, 744 A.2d 915 (2000); see also In reHector L., 53 Conn. App. 359, 366, 730 A.2d 106 (1999). In addition to reliance upon direct evidence, it is the fact finder's prerogative "to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted; citation omitted.) State v. Copas, 252 Conn. 318, 338,746 A.2d 761 (2000); In re Cheyenne A., 59 Conn. App. 151, 159,256 A.2d 303 (2000). In child protection matters, as in other cases, CT Page 10937 "[t]he law does not distinguish between direct and circumstantial evidence as far as probative force is concerned." (Quotation marks, citations omitted.) In re Cheyenne A., supra, 59 Conn. App. 158-9. "The probative force of conflicting evidence is for the trier to determine. . . .In re Ashley E., 62 Conn. App. 307. 316, ___ A.2d ___ (2001)." In reJonathon G., 63 Conn. App. 516. 528, 777 A.2d 695 (2001).
[8] As Alan P. was not present at the hearing on November 30, 1999, the court made a finding of default against him. The neglect adjudications were based on nob contendere pleas which were tendered to Judge Driscoll by Joseph M. and Sally S-P. See footnote 12.
[9] A second daughter, Cristina, was born to Joseph M. and Debora D. in 1998. (Testimony of Debora D., Joseph M.)
[10] Joseph M.'s contemporaneous conviction of assault upon an officer was reversed on appeal.
[11] On November 30, 2001, the court (Parker, J.) reduced Joseph M.'s total effective sentence by six months, leaving intact the order for probation to commence immediately upon his discharge from the DOC. (Exhibits 6, A-16, V). Docket Nos. CR97-00XX, CR21-XX, CR21-XX. See C. Tait, Connecticut Evidence (3d Ed. 2001) § 2.16.5, JudicialProceedings and Records.
[12] "The plea of nob contendere is of ancient origin. . . . [and] admits for the purposes of the case all facts that are well pleaded." (Internal and external citations omitted.) State v. Bridgett, 3 Conn. Cir. Ct. 206, 208-09, 210 A.2d 182 (1965). A party's plea of nolo contendere is not an express admission of the facts alleged, but indicates the party's consent to be treated as though the allegations against him were true. State v. Linares, 32 Conn. App. 656, 660, 630 A.2d 1340 (1993).
[13] Exhibit Z establishes that from March 30 to October 1, 1998 Joseph M. attended A A/NA meetings and completed an Anger Management Mental Health program: he also attended A A/NA meetings in November and December 1998. Joseph M. received certificates for participating in the Tier I substance abuse program ( December 30, 1998), a second Tier I substance abuse program (March 31, 1999), the Gang Awareness program (May 24, 1999), and the Cultural Awareness program (June 11, 1999). He attended a third Tier I program from April through June 1999, and received a Connecticut State High School Diploma on August 23, 1999. (Exhibit Z.) The evidence does not reflect that Joseph M. participated in any DOC rehabilitation programs after August 1999, other than mental health counseling. (Exhibit A-1a.)
CT Page 10938
[14] The psychological interview took place in a courthouse holding cell and the parent-child observation took place in a separate small office. The court credits Dr. Rogers's opinions that while Joseph M. was not candid, but guarded and overly familiar with many aspects of the examination process, nonetheless "a meaningful and representative sample of [Joseph M.'s] present psychological functioning was obtained" through this evaluation. (Exhibit 11.)
[15] The evidence also reflects that Joseph M. has an unspecified criminal history in New York state. (Exhibit 1.) A number of Joseph M.'s encounters with the criminal justice system occurred after Danny was born, but prior to the imposition of protective custody in November 1999. In April 1991, Joseph M. was convicted of larceny in the sixth degree, relating to an offense which had occurred before Danny's birth. In July 1991, when Danny was five months old, Joseph M. was convicted of burglary in the third degree, and sentenced to one year in jail. In May 1992, when Danny was just over a year old, Joseph M. was convicted of criminal mischief in the third degree and placed on probation for one year. In January 1994, just prior to Danny's third birthday, Joseph M. was convicted of larceny in the sixth degree, and a fine was imposed. In June of 1994, when Danny was three years old, Joseph M. was again convicted of larceny in the sixth degree, and was placed on probation for one year. In August of 1994, Joseph M. was convicted of breach of peace and a fine was imposed. In May of 1995, when Danny was just over four years old, Joseph M. was convicted of assault in the third degree and violation of a criminal protective order, and was placed on probation for eighteen months. In August of 1995, when Danny was four and a half years old, Joseph M. was convicted of two counts of burglary in the third degree, two counts of violation of probation, and single counts of larceny in the fourth degree, larceny in the fifth degree, and interfering with an officer. His existing probation was terminated, and Joseph M. was sentenced to serve an effective sentence of eighteen months of incarceration. In January of 1996, just prior to Danny's fifth birthday, Joseph M. was convicted of larceny in the third degree, and was ordered to serve one year concurrent with his previous sentence. In May of 1998, when Danny was seven years old, Joseph M. was again convicted of burglary in the third degree, and received a sentence of five years in jail, suspended after eight months, with three years of probation. As described above, in December 1998, when Danny was nearly eight, Joseph M. was sentenced for convictions of interfering with an officer, larceny in the sixth degree and counts of criminal trespass, relegated to serving a comprehensive sentence of five years of incarceration, suspended after four years, with five years of probation, as a persistent larceny offender. As described in footnote 9. Following the appeal, this sentence CT Page 10939 was reduced by six months but probation conditions remain in effect for five years. See footnote 11. (Exhibits 6, A-16.)
[16] The respondent father admits that some of his transfers were made for disciplinary purposes. (Testimony of Joseph M.)
[17] Joseph M. explains that he was subjected to disciplinary actions due to the "`waves'" that were created by his complaints about his multiple transfers and "alleged harassment by guards." (Exhibit 11.)
[18] Joseph M. has a long history of being charged with violation of prison rules and regulations. He admits that during his incarceration from 1995 through 1997, he was subject to approximately seven disciplinary actions. (Testimony of Joseph M.)
[19] In Danny's eyes, Alan P. thus displaced Joseph M. as a father figure even though from July 1995 through January 1997, Irene A. often brought the child to prison visits with the respondent father. (Testimony of Irene A., Dr. Rogers.)
[20] Irene A. has involved Danny in discussions about options that might be available if the TPR issues were amicably resolved or found in favor of Joseph M. During a court-ordered psychological evaluation, she admitted to having told Danny ""I'm gonna keep fighting for you, "' although it is not clear that she understood the significant amount of pressure such a statement could place upon the small shoulders of an pre-adolescent child with a history of parentified behavior. (Exhibit 11.)
[21] It is notable that when he was with his siblings and biological parents, Danny served as the group's organizing influence. When he is in the presence of his foster parents, however, he chiefly plays in an age-appropriate manner, without demonstrating the parentified behaviors that have been observed in the past.(Exhibit 11.) The court credits Dr. Rogers's expert opinion that this improvement in Danny's behavior is due to the salutary caregiving efforts of his foster parents. (Testimony of Dr. Rogers.)
[22] As Danny has a rather complete understanding of the legal implications of adoption, the expression of these desires may be due to the child's natural allegiance to those adults he has come to recognize as having played an important role in his life in the past. Although Danny is a child who would like to please everyone, he has clearly indicated that he would not prefer to have Irene A. serve as his primary CT Page 10940 caretaker. (Testimony of Ashley S., Dr. Rogers.)
[23] Tyler, Alissa and Angela refer to Holly and Daniel P. as ""mommy' and "daddy."' (Exhibit 11.)
[24] "Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the four grounds for termination of parental rights set forth in [§ 17a-112 (c)] exists by clear and convincing evidence. The commissioner . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . In re Eden F., 250 Conn. 674, 688-89, 741 A.2d 873 (1999)."In re Quanitra M, 60 Conn. App. 96, 102, 758 A.2d 863, cert. denied,254 Conn. 903, 762 A.2d 909 (2000).
[25] "Despite Practice Book § 33-3(a) and case law regarding termination proceedings generally, we have determined that with regard to termination petitions brought under § 17a-112 (c)(3)(B), the trial court may, in the adjudicatory phase, properly consider facts and events that occur after the filing date of the petition in determining whether a respondent has achieved a sufficient degree of personal rehabilitation within the meaning of that statute. See In re Stanley D.,61 Conn. App. 224, 230, [763 A.2d 83] (2000)." In re Latifa K,67 Conn. App. 742, 748, 789 A.2d 1024 (2002). Events occurring after the date of the filing of the TPR petition are particularly relevant to the issue of "whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time. See In re Amber B., 56 Conn. App. 776, 785, 746 A.2d 222
(2000); see also In re Sarah M., 19 Conn. App. 371, 377, 562 A.2d 566
(1989)." (Emphasis in the original.) In re Stanley D., supra,61 Conn. App. 230.
[26] In child protection cases, "[a]lthough [n]either the word reasonable nor the word efforts is . . . defined by our legislature or by the federal act from which the requirement was drawn . . . [r]easonable efforts means doing everything reasonable, not everything possible." (Emphasis added; internal quotation marks and citation omitted.) In reMariah S., 61 Conn. App. 248, 255, 763 A.2d 71 (2000), cert. denied,255 Conn. 934, 767 A.2d 104 (2001). Only "reasonable" efforts are required for reunification because "[i]t is axiomatic that the law does not require a useless and futile act." (Citation omitted.) In re Antony B., 54 Conn. App. 463, 476, 735 A.2d 893 (1999).
[27] While the court (Driscoll, J.) had stated that reunification CT Page 10941 efforts "can continue with [Joseph M.]" at the hearing on December 19, 2000, this ruling must be examined in the light of the circumstances surrounding the court's determination on that date. (Exhibit DD.) At that hearing, Joseph M. clearly implied that he would be discharged from incarceration within a period of weeks, stating: "I'm going for a sentence review hearing that looks like 80 or 90% in my favor of January23rd that I will be released from incarceration." (Emphasis added.) (Exhibit DD.) In describing the events that led to his incarceration, Joseph M. minimized his status as a convicted persistent larceny offender, merely informing the court: "My controlling sentence is for trespassing and larceny 6th. It's just an unfortunate incident that just happened three years ago, Your Honor, and I've been in jail ever since. . . ." (Exhibit DD). The court directly responded to Joseph M.'s representations when extending DCF's reunification obligations: "What I recommend is [Joseph M] gets out on January 23rd or shortly after thathearing, that [his counsel] requests an immediate case status conference. So you can sit down and review in light of what would be adramatic change of circumstances then." (Emphasis added.) (Exhibit DD.) However, as found in Parts I. B. and I. C., Joseph M. was not released from incarceration on January 23, 2001 or shortly thereafter, but remained incarcerated following the December 2000 pronouncements, until his release on parole on January 8, 2002. Notwithstanding his protestations that he desired to end his prison sentence as soon as possible, as found in Part I. C., Joseph M. was subjected to DOC discipline for a disruption that occurred in April 2001, following the hearing before Judge Driscoll. Neither of these developments were within Judge Driscoll's ken on December 19, 2000.
[28] Generally, while a respondent parent is imprisoned, DCF is effectively excused from providing reunification services other than visitation. See In re Roshawn R., 51 Conn. App. 44, 56-57, 720 A.2d 1112
(1998). For a review of Superior Court cases applying this rule, see Inre Destiny Q., Superior Court, Juvenile Matters, Child Protection Session, Docket No. U06-CP98-002230-A (November 19, 2001, Levin,J.).
[29] Clear and convincing evidence permits the logical inference that Joseph M. received counseling at McDougall Correctional Institution's mental health unit during most recent incarceration. Documentary evidence reflects that in December 2000, a DOC mental health unit staff member responded to his inquiry, stating: "you're doing fine — keep working on mind and attitude changes. This will help you when you leave DOC. You have to do the beginning work now in order to see the changes and improvements when you leave here." (Exhibit A-1a.)
CT Page 10942
[30] The respondent has offered no basis, in law or reason, for requiring DCF to duplicate counseling or rehabilitation services that are offered to inmates through DOC.
[31] See Parts I. B. and I. C., and footnote 15.
[32] The respondent father's history of aberrant conduct as well as convictions is relevant to determining whether his "habits and acts of misconduct" are such that he has the ability to diminish any potential to serve as a responsible parent by denying a child in his custody "the care, guidance or control necessary for [his] physical, educational, moral or emotional well-being." In re Helen B., 50 Conn. App. 818, 819,719 A.2d 907 (1998); In re Michael D., 58 Conn. App. 119, 124-125,752 A.2d 1135, cert. denied, 245 Conn. 911, 759 Conn. 505 (2000).
[33] The evidence in this matter clearly and convincingly establishes that although he was moved from facility to facility on numerous occasions, Joseph M. failed to consistently advise DCF of his current whereabouts, thereby restricting DCF's opportunities for making the advance arrangements that were reasonably required for the child's transportation to the visits. The court finds that DCF made appropriate efforts to contact the expected correctional facility, just prior to transporting Danny to a visit, to check that the respondent father was still available. (Testimony of Ellen M.) The court further finds that DCF reasonably determined that visits could not occur when Joseph M.'s physical location remained unknown.
[34] Court Exhibit 5, submitted as evidence on June 11, 2002 by agreement of the parties, indicates that Danny visited with his father at the prison on either the 16th or 18th of April 2000, and that either DCF or Irene A. provided transportation. Exhibit HH, prepared by a DCF employee, clearly indicates that on April 18, 2000, not DCF but the "[Paternal Grandmother] took Danny to see his [father] in jail."
[35] Any father-son visits thus required Danny to be transported to the correctional facility where Joseph M. was confined: the respondent has provided no basis, in law or fact, to support the conclusion that it would have been reasonable for DCF to transport Danny to a prison facility in Virginia to effectuate visits with his father. Visitation was available at the correctional facilities during hours when school was in session: in response, DCF made the reasonable determination that, given his age and emotional needs, Danny should be removed from school only on a limited basis. (See Testimony of Ellen M.) The court finds that the applicable visitation schedule equitably accommodated the father and met the child's best interests, as well.
CT Page 10943
[36] As discussed in footnote 25, the court had been led to assume that Joseph M. would be released from incarceration in January 2001, a "dramatic change of circumstances" that would have allowed the reasonable facilitation of additional visits with Danny. (Exhibit DD.) Joseph M.'s continued incarceration significantly curtailed any increase in visitation, however.
[37] As found in part I. E. 1., the evidence clearly reflects that Irene A. has herself raised TPR litigation issues with Danny: by stating that she will continue to "fight" for the child, the paternal grandmother has effectively raised Danny's level of anxiety about the conflicts between the biological parents, DCF and the foster family. (Testimony of Dr. Rogers.)
[38] Holly P., the foster mother, logically and credibly testified that when Danny first raised questions about his adoptability, she referred him to his attorney for the provision of appropriate information. (Testimony of Holly P.)
[39] Joseph M.'s attorney has acknowledged that "under the law there's no reunification program" as to a grandmother and a child involved in child protection proceedings. (Exhibit DD.)
[40] Even if Joseph M. is successful in this aspect of his argument, as fully discussed in Part II. C., the court has found that the respondent was unwilling or unable to benefit from reasonable reunification efforts, as contemplated by § 17a-112 (j)(1).
[41] As found in Part I. A, although Irene A. had served as the child's guardian and primary caretaker during an earlier period, Sally S-P.'s guardianship was formally restored by the Probate Court in 1997. From November 1999 through January 2000, Danny was in Sally S-P.'s care under protective supervision.
[42] See footnote 17.
[43] Commencing in June of 1998, Irene A. has been advising DCF that she was considering serving again as Danny's legal guardian. However, the court received no reliable evidence that Irene A. ever specifically protested that her absence from Danny was in any way causing an adverse effect upon the father-son relationship. (Exhibits A, F, H.)
[44] Dr. Rogers diagnosed Irene A. with Anxiety Disorder, Not Otherwise Specified. and also found that she has indications of Schizoid and CT Page 10944 Dependent Personality Traits. In 1999, Dr. Rogers indicated that Irene A. would benefit from psychotherapy and medication to address her anxiety condition. However, the evidence does not reflect that Irene A. has ever pursued the recommended treatment. (See Exhibits 11, 12.)
[45] Exhibit E., tendered by Joseph M., references Irene A.'s arrest in 1998 for alteration of a prescription for a controlled substance. The matter was disposed of by accelerated probation. (Exhibit E.) Irene A. admitted to Dr. Rogers that her son, Joseph M., had actually committed the criminal act that led to her arrest and prosecution. (Exhibit 11.)
[46] The evidence as a whole clearly and convincingly establishes that rather than seeking to serve as a reunification resource, Irene A. has sought visitation based on her apparent assumption that she has fundamental "rights" to the child She admitted to Dr. Rogers that Danny "belongs" to her, raising implications that she view her grandson as an item to be possessed. It appears that, as the years have passed, Irene A. still views Danny as a young child who once welcomed the opportunity to accompany her at adult past-times such as yard and rummage sales and extended family gatherings. (Exhibit 11.) Like Joseph M., Irene A. seems to have no notion of the social and emotional development Danny has experienced during his years in foster care, and no appreciation of the child's newly founded self-esteem and independent spirit.
[47] Although Irene A. has had long periods of unemployment, she worked as a cashier in 1998. (Exhibits 11, 12.) She receives SSI benefits because of reported back pain, which has recently been aggravated by injuries sustained in a motor vehicle accident. (Exhibit 12.)
[48] General Statutes § 17a-112 (1)(3)(B) provides that parental rights may be terminated by the Superior Court as to: "the parent of a child who (i) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding, or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and such parent has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ."
[49] "`Personal rehabilitation as used in [Section 17a-112] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [The statute] requires the trial court to . . . to CT Page 10945 find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life.' (Citations omitted; internal quotation marks omitted). In re Eden F., [250 Conn. 674, 706, 741 A.2d 873
(1999)]. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. (Internal quotation marks omitted). In re Shyliesh H., [56 Conn. App. 167, 180, 743 A.2d 165
(1999)]." In re Sarah Ann K., 57 Conn. App. 441, 448, 779 A.2d 47
(2000). See also In re Gary B., 66 Conn. App. 286, 292, 784 A.2d 412
(2001).
[50] Section 17a-112 (p) establishes that the provisions of § 17a-112
(j)(3)(B) "shall be liberally construed in the best interests of any child for whom a petition under this section has been filed."
[51] It is fundamental that psychological evidence presented through professionals "is rightly accorded great weight in termination proceedings." (Internal quotation marks and citation omitted.) In re JohnG., 56 Conn. App. 12, 24, 740 A.2d 496 (1999).
[52] The court notes Sally S-P.'s explanation that these criminal charges were addressed through accelerated rehabilitation. (Exhibit 11.)
[53] As found in Part I. B., upon the birth of his first daughter, Joseph M. chose to live apart from Danny, allowing Irene A. to serve as his son's primary caregiver while Sally S-P. received mental health treatment. (Exhibit 1; Testimony of Joseph M.)
[54] For example, throughout the course of trial, Joseph M. protested that during his recent incarceration he was deprived of the opportunity to participate in any parenting education program because such services was not made available to him by the DOC. (Testimony of Joseph M.) Naively or disingenuously, Joseph M. persists in blaming others for his deprivation. This evidence makes it clear that Joseph M. lacks the ability or the willingness to recognize that it was his own repeated violation of the law that led him to be incarcerated and thereby subject to the constraints intrinsic to DOC's provision of rehabilitation services. (See Testimony of Dr. Rogers). "As our courts have recognized, there is no entitlement to rehabilitative programs while incarcerated. See Wheway v. Warden, 215 Conn. 418, 431, 576 A.2d 494 (1990) (prison authorities have full discretion to grant or deny early release programs CT Page 10946 and to control certain conditions of confinement, including eligibility for various rehabilitation programs); see also Smith v. Liburdi,26 Conn. App. 254, 259, 600 A.2d 17, 20 (1991), cert. denied.221 Conn. 910, 602 A.2d 9 (1992).
[55] Notably, the evidence clearly and convincingly reflects that although he had already completed the multi-faceted Tier I rehabilitation programs, in April 2001, just prior to the institution of the TPR petition, he became involved in an altercation with his cellmate over a minor incident related to the presence of food in their cell. This altercation required the intervention of a corrections and again resulted in the imposition of a penalty upon Joseph M. This incident indicates that Joseph M. has neither gained respect for authority, nor the willingness or ability to conform to expected standards of lawful, non-disruptive behavior. (See Testimony of Joseph M.)
[56] Through the delivery of his trial testimony, Joseph M. clearly revealed that he is only able or willing to acknowledge the positive aspects of his conduct during his incarceration, represented by the programs he has ostensibly attended and the certificates he has earned. He clearly remains unable or unwilling to take appropriate responsibility for his inappropriate conduct both before and during his incarceration. (Testimony of Joseph M.)
[57] See footnote 15.
[58] On March 12, 2002, two months following his discharge from prison, Joseph M. remained in residence with his mother and step-father. (Testimony of Joseph M.)
[59] As Dr. Rogers has written, "[Joseph M.] shows a chronic pattern of self-focus and disregard for others' welfare. This seems characterological, and resistant to change. The aforementioned limitations have long been evident and have not meaningfully altered in a significant period." (Exhibit 11.) This conclusion is fully supported by the evidence.
[60] Compliance with specific steps does not, in and of itself, evince a parent's rehabilitation in the context of a TPR proceeding based on § 17a-112 (j)(3)(B) allegations. The Appellate Court has confirmed that, "[i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether thosefactors were included in specific expectations ordered by the court or imposed by the department. See In re Michael M, 29 Conn. App. 112, 125, CT Page 10947614 A.2d 832 (1992); see also In re Migdalia M, 6 Conn. App. 194, 206,504 A.2d 533, cert. denied, 199 Conn. 908, 508 A.2d 770 (1986)." (Emphasis added.) In re Vincent D., 65 Conn. App. 658, 670, 783 A.2d 534
(2001).
[61] In ascertaining whether Joseph M. will achieve rehabilitation within a reasonably foreseeable time, he urges: "The fact that Mr. M got himself released from prison before the end of the trial must be considered in assessing the `reasonable' time. . . . [T]he evidence that he got out a year earlier [than] the state stated may be considered as proof that their allegations were inaccurate and that must be considered in the "prospective' component of the statute, that he can resume a responsible role in the child's life within a "reasonable' time." Respondents Memorandum of Law re: Pleadings, filed April 29, 2002 (Respondent's Memorandum).
[62] In this regard, the court finds General Statute § 53a-28 (d) to provide appropriate guidance in establishing that notwithstanding his release from incarceration, Joseph M. cannot reasonably be considered thereby to have achieved the rehabilitation that is contemplated in child protection matters, as "[a] sentence to a period of probation . . . shall be deemed a revocable disposition, in that such sentence shall be tentative to the extent that it may be altered or revoked. . . ." This provision is consistent with the language and intent of General Statutes § 53a-32, which establishes the parameters for Joseph M.'s arrest in the event of a violation probation, and the potential that he will be returned to prison to serve the surviving sentence.
[63] At the commencement of trial, Joseph M. had asked the court to consider his pending Motion to Revoke Commitment and Transfer Guardianship, intending that while he was incarcerated, Irene A. would assume Danny's care and custody. On January 9, 2002, in the midst of trial but immediately subsequent to his release on parole, Joseph M. withdrew the pending motions, and asked that Danny M. be restored to his care, so that father and son could reside together at Irene A.'s home. Joseph M. indicated that he intended to secure weekend access to his daughters Amanda and Cristina, but presented no further specific plans for his son's support. growth or development. (Testimony of Joseph M.)
[64] The TPR petition, filed using Form JD-JM-40, alleged in relevant part that "The child/youth has been found in a prior proceeding to have been neglected or uncared for AND the . . . father has/have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of CT Page 10948 the child/youth, he/she/they would assume a responsible position in the life of the child/youth . . ." In March 2001, the petition was served upon Joseph M. at Cheshire CI, where he was incarcerated, serving the sentence as specified in Parts I. B. and I. C.
[65] Closing arguments were presented on March 12, 2002. On April 9, 2002, the court heard additional evidence related to the circumstances under which Joseph M. had tendered his December 19, 2000 plea of nolo contendere in response to the neglect petition for Danny. Thereafter, on June 3, 2002 as referenced in footnote 31, the parties submitted documentary evidence reflecting Danny's visitation with his father.
[66] Practice Book § 32-1 states, in pertinent part: "(a) The petitioner shall set forth with reasonable particularity, including statutory references, the specific conditions which have resulted in the situation which is the subject of the petition. (b) A summary of the facts substantiating the allegations of the petition shall be attached thereto and shall be incorporated by reference.
[67] The petitioner rested on December 14, 2001, having completed her presentation of evidence related to adjudicatory issues. She had reserved, and later utilized, the right to call the foster mother as a witness on dispositional issues alone.
[68] "Whether a complaint gives sufficient notice is determined in each case with reference to the character of the wrong complained of and the underlying purpose of the rule which is to prevent surprise upon the defendant." (Quotation marks and external citation omitted.) Tedesco v.Stamford, supra, 215 Conn. 459.
[69] In his memorandum, Joseph M. has also argued that "due process . . . clearly limits just how broadly or liberally the court may construe pleadings." Respondent's Memorandum. In doing so, he has relied upon two Appellate Court decisions which were subsequently reversed upon consideration by the Supreme court. See In re Eden F., 48 Conn. App. 290,710 A.2d 771 (1998), rev'd, 250 Conn. 674, 741 A.2d 873 (1999); Orsi v.Sentore, 31 Conn. App. 400, 626 A.2d 750.(1993), rev'd and remanded,230 Conn. 459, 645 Conn. 986 (1994). Insofar as the petitioner has ostensibly asserted a constitutional violation without identifying whether it is state or federal due process grounds to which he refers, and without sufficiently developing his argument, the court is constrained to "deem his due process claims to be abandoned." State v.Vega, 259 Conn. 374, 402 n. 15, 788 A.2d 1221 (2002).
[70] The trial, which took place over the course of several months, CT Page 10949 provided the respondent with such time from December 14, 2001, when the petitioner rested her case, through January 9, 2002 when the case was next heard, and again until March 12, 2001 when the case was concluded except for evidence related to Joseph M.'s November 1999 nolo contendere plea.
[71] "Our statutes and case law make it crystal clear that the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence." In re Valerie D.,223 Conn. 492, 511 and n15, 613 A.2d 478 (1992); see also In re QuanitraM., supra, 60 Conn. App. 104.
[72] Such findings are required as to Sally S-P. and Joseph M. only, in light of Alan P.'s valid consent to TPR. § 17a-112 (k).
[73] Dr. Rogers explained that a psychological parent is a person who provides structure, security and nurturance for a child on a consistent, long-term basis. (Testimony of Dr. Rogers.)
[74] As Dr. Rogers credibly observed: "[t]here appears to be a connection between [Danny and Irene A.], and Danny seems to acknowledge his grandmother's role as an important relative . . . [I]t was clear that the child's enthusiasm for their interaction was muted . . . and he does not look to her for nurture or support." (Exhibit 11.)
[75] Even if this argument was valid, it would be of limited effect, operative only from the spring of 2000 through May 2001. Thereafter, as found in Part I. E. 1., in May 2001, DCF accommodated Irene A.'s request to see the child, and scheduled Danny for two full days of visitation per month.(Exhibit Q.) However, in the fall of 2001, DCF reasonably reduced Irene A.'s visits to once per month in response to Danny's noted discomfiture with the enhanced visitation schedule.(Testimony of Ellen M., Holly P., Ashley S., Dr. Rogers.)
[76] "[T]he harm prong in Roth allows for allegations of both physical and emotional harm." Clements v. Jones, 71 Conn. App. 688, 693, ___ A.2d ___ (2002).
[77] Even if this argument was valid, it would be of limited effect, operative only from the spring of 2000 through May 2001. Thereafter, as found in Part I. E. 1., in May 2001, DCF accommodated Irene A.'s request to see the child, and scheduled Danny for two full days of visitation per month.(Exhibit Q.) However, in the fall of 2001, DCF reasonably reduced Irene A.'s visits to once per month in response to Danny's noted CT Page 10950 discomfiture with the enhanced visitation schedule.(Testimony of Ellen M., Holly P., Ashley S., Dr. Rogers.)
[78] If DCF had disregarded Sally S-P.'s fundamental right to deny visitation to a third party by allowing increased visitation between Irene A. and Daniel M., the agency could have been in violation of either the spirit or the letter of the Troxel and Roth decisions.
[79] The final element of the termination of parental rights statute, § 17a-112 (c), requires that before granting a duly noticed petition for such termination, the court must find, "by clear and convincing evidence . . . (2) that termination is in the best interest of the child. . . ."
[80] "Termination of parental rights means the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's parent or parents. . . ." (Quotation marks and internal citation omitted.)In re Steven N., 57 Conn. App. 629, 632, ___ A.2d ___ (2000). "[T]he question . . . to be decided in a dispositional phase is whether it is in the best interests of the child to sever the parent-child relationship. That is different from the question of who should have custody of the child if termination of parental rights is determined to be in the best interests of the child. See Practice Book § 33-5." In re Carissa K., 55 Conn. App. 768,776, 740 A.2d 896 (1999). "In making this determination, the trial court can consider all events occurring prior to the date of the dispositional hearing, including those occurring after the filing of the termination petition." (Citation omitted.) In re Kasheema L., 56 Conn. App. 484, 488,744 A.2d 441 (2000).
[81] In deciding whether termination of the respondents' parental rights would be in the best interests of these children, the court has examined the multiple relevant factors, including the children's' interests in sustained growth, development, well-being, stability and continuity of their environment; their length of stay in foster care; the nature of their relationship with their foster parents and biological parents; and the degree of contact maintained with their biological parents. In re Alexander C., 60 Conn. App. 555, 559, ___ A.2d ___ (2000);In re Shyina B., 58 Conn. App. 159, 167, ___ A.2d ___ (2000); In re Savanna M, supra, 55 Conn. App. 816. Also, "the genetic bond shared by a biological parent and his or her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider." (Citations and quotation marks omitted.) Id. In a matter such as this, the court must balance the children's intrinsic needs for CT Page 10951 stability and permanency against any benefits of retaining a legal connection with their biological parents. Pamela B. v. Ment, 244 Conn. 296,314, 709 A.2d 1089 (1998).
[82] As Dr. Rogers credibly reported in the fall of 2001, when Sally S-P. is in the presence of her offspring, she is "overwhelmed with the demands of the children . . . While she is clearly an important figure to all of them, her skills, tolerance and ability to persist all seemlacking to a worrisome degree." (Emphasis added.) (Exhibit 11.)
[83] The court credits Dr. Rogers's finding that Alan P. inappropriately attributes all of his problems with the children to the DCF's intervention and Sally S-P.'s failings. (Exhibit 11.)
[84] Dr. Rogers credibly emphasized that any decision to remove Danny from his current foster home, and from the companionship provided by his siblings, would adversely affect the child on a psychological basis, causing withdrawal and retarding his emotional growth. In reaching this conclusion, Dr. Rogers clearly and convincingly established that it would not be in Danny's best interests to remove him to the care of Irene A., although she had served as his primary caretaker some years ago. While the child still cares for his paternal grandmother, his current foster home provides optimal opportunities for Danny's healthy growth and development. The court credits Dr. Rogers's opinion that the benefit of the present placement, where Daniel resides with his siblings in a predictable and consistent environment, far outweighs any benefit that could accrue from reuniting the child with either Joseph M. and/or Irene A. (Testimony of Dr. Rogers.)
[85] As Dr. Rogers credibly opined, Danny's connection to his siblings "is important to him and, given the boy's limited ability to navigate the social milieu, it is critical that it be honored and perpetuated." (Emphasis added.) (Exhibit 11.)
[86] Joseph M. has not called DCF to inquire about the status of his child, and has relied instead upon his mother, Irene A., to perform that task. The court finds no basis for crediting the testimony attempting to establish that Joseph M. has regularly sent cards and letters to the child, but that others have prevented Daniel from receiving these items. (Testimony of Irene A., Joseph M.) In reaching this determination, the court fully considered Irene A.'s heartfelt testimony at trial, "based on its firsthand observation of [her] conduct, demeanor and attitude" and based on its review of the evidence as a whole. State v. Owens,63 Conn. App. 245, 251, ___ A.2d ___ (2001); see also In re Ashley E., supra, 62 Conn. 316; In re Pascacio R., 52 Conn. App. 106, 114-115, CT Page 10952726 A.2d 114 (1999). Under such scrutiny, the court finds that Irene A.'s testimony was affected by her allegiance to her own son; by her clear efforts to protect Joseph M.'s interest in the outcome of the matter; and by her desire to have Danny M. once again return to her personal care and custody. (Testimony of Irene A., Joseph M.) Under these circumstances, the court finds Irene A.'s testimony to carry little weight.
[87] Joseph M. has given no indication that he comprehends the value of the ties that Danny has formed with his foster parents and the younger siblings with whom he lives. He has not shown that he is aware of or that he appreciates the personality Danny has developed while living in an environment in which he his loved and cared for, but neither burdened with overwhelming responsibilities, nor adored to a point which threatens to rob him of the ability to function in a normal social manner.
[88] In reaching this determination, the court has fully credited the cogent, credible opinion tendered by Ashley S., who maintains a confidential therapeutic relationship with Danny. The therapist's testimony was thorough, detailed, well-founded upon his skill and experience treating Danny, and was found to be objective and unbiased in favor of or against any party to this action. After a very lengthy period of providing individual counseling to Danny, Ashley S. has discerned the child's preferences. As Ashley S. credibly opined, Danny is happy with life as he knows it in his foster home, and prefers this to the previous residential experiences he has had. The court credits Ashley S.'s assessment that Danny's overriding personal goal is to be adopted by Holly and Daniel P. so that he can live with the siblings he knows so well: the court further credits the child's expressed desires to retain contact with Sally S-P., Alan P., Irene A., Joseph M., and Joseph M.'s daughters, as well. (Testimony of Ashley S.) In explaining the psychological basis for Danny's seemingly inconsistent desires, Dr. Rogers clearly and convincingly explained that a child, such as Danny, who truly prefers to stay in his current, secure placement, will nonetheless feel compelled to state a desire for reunification as a means of pleasing the biological parents to whom he maintains an underlying allegiance, and whom he does not wish to disappoint. (Testimony of Dr. Rogers.)
[89] The foster parents maintain a calm and well organized household, which includes their single biological child as well as the four children who are the subject of this petition. (Exhibit FF.) In re Vincent D.,65 Conn. App. 658, 666, __ A.2d __ (2001) (suitability of adoptive parents is relevant to the court's consideration of best interest issues).
CT Page 10953